IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02612-JLK-CBS

LEAH TURNER, ARACELI GUTIERREZ, MARKEITTA FORD,
JOLESSA WADE, DANYA GRANADO, BRETT CHARLES, and
RUBY TSAO

individually and on behalf of others
similarly situated

Plaintiff,

v.

CHIPOTLE MEXICAN GRILL, INC.,

Defendant.

## DECLARATION OF LEAH TURNER

1.      I, Leah Turner, certify that I am over the age of eighteen years, that the statements made in this Declaration are true and correct to the best of my knowledge, and that I have personal knowledge of the statements made herein.

2.      I was employed by Defendant Chipotle Mexican Grill, Inc. ("Chipotle") as a non-exempt hourly paid employee from March 2010 through May 2011. During this time I worked at the Parker restaurant, located at 18701 E. Main Street, Parker, CO 80134.

3.      I was employed by Chipotle as a non-exempt hourly-paid Kitchen Manager from March 2010 through June 2010, preparing, serving and selling Chipotle food products, and perform other related tasks, including cleaning.

4.      I was employed by Chipotle as a non-exempt hourly paid Service Manager from June 2010 through May 2011.



5.      Thereafter, on or about August 2011, I was an exempt salaried employee serving as the General Manager at the Castle Rock restaurant located at 5642 Allen Way, Space 104, Castle Rock, CO 80104.

6.      Myself and other employees from March 2010 through May 2011 were often required to work past 12:30 a.m. without being given additional pay. The duties included deep cleaning of the kitchen and fryers, preparing audits, and stocking for the following day.

### Chipotle Employees Were Forced to Work Off the Clock After 12:30 a.m.

7.      During my employment with Chipotle, from March 2010 through May 2011, I was forced to work off the clock, often after 12:30 a.m. I have not been fully and properly compensated for regular/straight time and/or overtime for the hours I worked off the clock.

8.      From March 2010 through May 2011, I worked many night shifts, which meant I was scheduled to work from 3:30 p.m. until after the restaurant's closing time. Although the restaurant closed at 10:00 p.m., cleaning, such as deep cleaning the fryers and the entire kitchen, and other tasks, such as audits, almost always required that I and the other employees on my shift work past 12:30 a.m. Chipotle's time clock, however, automatically punched us out at 12:30 a.m., even though we continued working after 12:30 a.m.

9.      Additionally, from March 2010 through May 2011, I and everyone else on the night shift were required to attend mandatory after-shift meetings, which occurred every night after all cleanup and other work had been completed. The mandatory after-shift meetings were required at all Chipotle stores in my Colorado "Patch" (meaning all stores supervised by my Area Manager, Serena Crabtree), and I believe they were generally required at all Chipotle stores. The mandatory after-shift meetings always took place either right before, or right after, the security system was armed for the evening. There was almost always a significant gap

between the time people clocked out, and the time they completed their work and the security system was armed for the evening. Night shift employees were not paid for this gap in time that they worked off the clock, which included not being paid for attending the mandatory after-shift meeting.

10.     I am aware that Chipotle has submitted employee handbooks stating that its policy is to compensate employees for all hours worked. Although this is Chipotle's stated policy, Chipotle's actual policy was to require employees to work off the clock after 12:30 a.m. Alejandra Garcia, General Manager at the Parker location, made it clear to me and other employees that the company expected us to finish our work by 12:30 a.m., and that we risked discipline, including termination, if we asked to be paid for time worked after the 12:30 a.m. "reset." I and other Chipotle employees were all subjected to this same policy.

11.     It was my understanding that we had to work off the clock to meet budget goals, and because bonuses for General Managers were based upon labor costs. Throughout each business day, the centralized, uniform Aloha POS system kept track of the day's labor costs and revenue. At any point during the day, the Aloha POS system could generate a number that told us whether we were on track for the day. From March 2010 through May 2011, during every shift I was required to check the day's labor costs approximately three (3) times per shift. Alejandra Garcia and Serena Crabtree would constantly call and ask me to check the labor costs to ensure that we were keeping our labor costs low. As a result of the desire to keep labor costs down, night shifts were usually understaffed, so that we could not get all of our assigned work done before the 12:30 a.m. "reset." Sometimes I was directed to punch myself and other night shift workers out to avoid having them automatically clocked out at 12:30 a.m., thereby avoiding

an inference of working through the 12:30 reset, but require them to keep working, due to budgetary concerns.

12.    Additionally, store budgets and prospective sales were set centrally via Chipotle's corporate, centralized, uniform computerized system, the Aloha system, not by the individual store managers or at a restaurant by restaurant or even region by region level. The Aloha computerized system set the amounts of sales and labor costs that each store needed to meet every day. If a store did not fall within these preset numbers managers were at risk for losing their jobs.

13.    As a result of Chipotle's policy of automatically punching its employees out at 12:30 a.m., I was not fully and properly compensated for time I worked at Chipotle from March 2010 through May 2011. This time often exceeded several hours per week in addition to the hours for which I was paid.

14.    During my employment, I witnessed other current and/or former employees, such as Brittany Links and Megan (Last Name Unknown), of being subjected to the same treatment, in that they were routinely punched out at (or before) 12:30 a.m. while still working, and were not compensated by Chipotle for regular/straight time and/or overtime for the hours they worked off the clock. I believe that other Chipotle employees at other Chipotle locations have also been subjected to this same treatment, based on conversations I have had with Tony Aguilera, an apprentice, who works at the Castle Rock, Colorado location, who told me he and others were required to work off the clock after 12:30 a.m., without compensation.

15.    Additionally, when I became the General Manager of the Castle Rock location and attempted to ensure that all employees were properly paid for the hours they worked, I was told by upper management, namely Serena Crabtree and Alejandra Garcia, that employees

working off the clock, past 12:30 a.m. were not supposed to be clocked back in for that time due to budget constraints.

16.     Moreover, while I was a General Manager of the Castle Rock location, I would attend "Patch Meetings" of all area General Managers under the supervision of Serena Crabtree. During these meetings we would discuss the fact that labor costs were forcing the General Managers to make people work off the clock and that this was unfair, nonetheless we were told if labor costs were not kept low our jobs were in jeopardy. Therefore, all General Managers and Area Managers knew that employees were commonly being required to work past the automatic 12:30 a.m. punch out and were not being compensated for this time. Specifically, I recall this being a concern and talking to General Managers: 1) Jenny Padilla who worked at the Belleview Colorado restaurant, store number 0599; 2) Brittany Link who worked at the Lone Tree Colorado Restaurant, store number 0143; 3) Brittany Swa who worked at the Centennial Colorado restaurant, store number 0254; 4) Suzanna Meza who worked at the Crown Point Colorado restaurant, store number 0719; 5) Augustine Venalonzo who worked at the Parker and Castle Rock Colorado restaurants, store numbers 0059 and 1049 respectively; 6) Laiza (Last Name Unknown) who worked at the Lone Tree Colorado restaurant, store number 0143; 7) Rebecca (Last Name Unknown) who worked at the Fitzsimmons Colorado restaurant, store number 0745; 8) Albert Zepeda who worked at the Belleview Colorado restaurant, store number 0599; 9) Isa (Last Name Unknown) who worked at the Castle Rock Colorado  restaurant, store number 1049; 10) Manuela Pedroza who worked at the Arapahoe/Park Colorado restaurant, store number 1291; 11) Adriana Angula, who worked at the Fitzsimmons Colorado restaurant, store number 0745; and 12) Alicia Olivas who worked at the Grand Junction Colorado restaurant, store number 0946. Additionally, during these "Patch Meetings" our area manager, Serena Crabtree was

present and aware of the General Managers concerns that budgetary concerns set by the computerized system and labor costs were forcing people to work off the clock after 12:30 a.m.

I declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 27, 2015.

Leah Turner

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:14-cv-02612-JLK

LEAH TURNER, ARACELI GUTIERREZ, MARKEITTA FORD,
JOLESSA WADE, DANYA GRANADO, BRETT CHARLES, and
RUBY TSAO

individually and on behalf of others
similarly situated

Plaintiff,

v.

CHIPOTLE MEXICAN GRILL, INC.,

Defendant.

---

## DECLARATION OF ARACELI GUTIERREZ

---

1.      I, Araceli Gutierrez, certify that I am over the age of eighteen years, that the statements made in this Declaration are true and correct to the best of my knowledge, and that I have personal knowledge of the statements made herein.

2.      I was employed by Defendant Chipotle Mexican Grill, Inc. ("Chipotle") as a non-exempt hourly paid employee Crew Member and/or Service Manager September 2012 through August 2014. During this time I worked at the Santa Ana restaurant, located at 1945 E. 17th Street, Santa Ana, California 92705.



EXHIBIT

2

3.      While I was employed as a Crew Member I was involved in, preparing, serving and selling Chipotle food products, and perform other related tasks, including cleaning.

4.      My duties were similar while I was employed as a non-exempt Service Manager.

5.      Myself and other employees from September 2012 through August 2014 were often required to work past 12:30 a.m. without being given additional pay. The duties included deep cleaning of the kitchen and fryers, preparing audits, and stocking for the following day.

Chipotle Employees Were Forced to Work Off the Clock After 12:30 a.m.

6.      During my employment with Chipotle, from September 2012 through August 2014, I was forced to work off the clock, often after 12:30 a.m. I have not been fully and properly compensated for regular/straight time and/or overtime for the hours I worked off the clock.

7.      From September 2012 through August 2014, I worked many night shifts, which meant I was scheduled to work from 4 p.m. to 11 p.m. Although the restaurant closed at 10:00 p.m., cleaning, such as deep cleaning the fryers and the entire kitchen, and other tasks, such as audits, almost always required that I and the other employees on my shift work past 12:30 a.m. Chipotle's time clock, however, automatically punched us out at 12:30 a.m., even though we continued working after 12:30 a.m.

8.      Additionally, from September 2012 through August 2014, I and everyone else on the night shift were required to attend mandatory after-shift meetings, which occurred every night after all cleanup and other work had been completed. The mandatory after-shift meetings were required at all Chipotle stores in my California "Patch" (meaning all stores supervised by my Area Manager, Perla Lara), and I believe they were generally required at all Chipotle stores. The mandatory after-shift meetings always took place either right before, or right after, the security system was armed for the evening. There was almost always a significant gap between the time people clocked out, and the time they completed their work and the security system was armed for the evening. Night shift employees were not paid for this gap in time that they worked off the clock, which included not being paid for attending the mandatory after-shift meeting.

9.      I am aware that Chipotle has submitted employee handbooks stating that its policy is to compensate employees for all hours worked. Although this is Chipotle's stated policy, Chipotle's actual policy was to require employees to work off the clock. Sara Carballo, General Manager at the Santa Anna location, made it clear to me and other employees that the company expected us to work off-the-clock to show dedication and commitment to the company. I was told that if I would not work off-the-clock I would not be a candidate for promotions. It was also indicated that we risked discipline, including termination, if we asked to be paid for time worked off-the-clock. I and other Chipotle employees were all subjected to this same policy.

10.    It was my understanding that we had to work off the clock to meet budget goals, and because bonuses for General Managers were based upon labor costs. Throughout each business day, the centralized, uniform Aloha POS system kept track of the day's labor costs and revenue. At any point during the day, the Aloha POS system could generate a number that told us whether we were on track for the day.

11.    From September 2012 through August 2014, Sara Carballo, General Manager; Stacy Anderson, General Manager of two restaurants; or Perla Lara, Area Manager, would tell me to clock out and keep working.

12.    As a result of Chipotle's policy of automatically punching its employees out at 12:30 a.m., I was not fully and properly compensated for time I worked at Chipotle from September 2012 through August 2014. This time often exceeded several hours per week in addition to the hours for which I was paid.

13.    During my employment, I witnessed other current and/or former employees being subjected to the same treatment, in that they were routinely punched out or told to clock out and continue working, and were not compensated by Chipotle for regular/straight time and/or overtime for the hours they worked off the clock.

### Chipotle Employees Were Forced to Work Off the Clock During the Day-Shift

14.    From September 2012 through August 2014 I was required to come in early for shifts or stay late from shifts but I was not paid for this time.

15.    I generally worked everyday from 4 p.m. until 11 p.m. However, I would often be asked to work from 2 p.m. until 11:30 p.m. Despite being asked to work these increases hours I was only permitted to clock in for my 'officially scheduled shift' of 4 p.m. – 11 p.m.

16.    This same practice occurred when I was scheduled to work from 4 p.m. – 11 p.m but then was asked to come in from 3 p.m. until 12:30 a.m. I would not be paid for these additional hours of work.

17.    Moreover, I would be asked to go to other Restaurant locations to pick up food and bring it to the Santa Ana location but was not paid for this travel time or mileage.

18.    It is my understanding that other Chipotle employees were also required to work off-the-clock during the day shifts and were not paid for all hours worked and associated overtime.

19.    Due to constantly being required to work off-the-clock and subjected to harassing and inappropriate work conditions, I ultimately decided to resign from Chipotle.

20.    In resigning I sent an electronic mail to Chipotle notifying them that I had been required to work off-the-clock many times involuntarily and not received any breaks. Despite notifying management that I had been required to work off-

the-clock many times involuntarily and not received any breaks, I never received any response or remuneration from Chipotle.

I declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 23, 2015

Araceli Gutierrez

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02612-JLK-CBS

LEAH TURNER, ARACELI GUTIERREZ, MARKEITTA FORD, JOLESSA WADE, DANYA GRANADO, BRETT CHARLES, and RUBY TSAO

individually and on behalf of others
similarly situated,

Plaintiffs,

v.

CHIPOTLE MEXICAN GRILL, INC.,

Defendant.

---

## DECLARATION OF MARKEITTA FORD

1.      I, Markeitta Ford, certify that I am over the age of eighteen years, that the statements made in this Declaration are true and correct to the best of my knowledge, and that I have personal knowledge of the statements made herein.  I am currently a named plaintiff in the case captioned *Turner et al. v. Chipotle Mexican Grill, Inc.*, No. 14-cv-02612 (D. Colo.).  I submit this Declaration in support of Plaintiffs' motion to conditionally certify a collective in the above-captioned action.

2.      I was employed by Defendant Chipotle Mexican Grill, Inc. ("Chipotle") from approximately January 3, 2014 until February 4, 2014.  I worked at the Chipotle restaurant located at 368 Route 10 West, East Hanover, New Jersey, 07936.



EXHIBIT

3

3.     I was employed by Chipotle as an hourly-paid crew member to prepare, serve and sell Chipotle food products, and perform other related tasks, including cleaning.

4.     During my employment with Chipotle, I usually worked the night shift, which meant I was generally scheduled to work from approximately 4:00 p.m. until 11:00 p.m., Wednesday through Sunday, for a total of thirty-five (35) to forty (40) hours per week.

5.     Although the restaurant closed at 10:00 p.m., cleaning the fryers, lobby, bathrooms, kitchen, and other tasks almost always required that I and the other night shift employees work past 11:00 p.m., usually until at least 11:15 or 11:30 p.m.  If I did not clock out as instructed, my manager would either clock me out, or erase from my time record a portion of the clocked time that I worked after my scheduled shift. As a result, I have not been fully and properly compensated for regular/straight time and/or overtime for the hours I worked off the clock.

6.     My off-the-clock duties included cleaning the kitchen and fryers, cleaning the lobby areas and bathrooms, doing dishes, and attending meetings. This generally added up to two to five hours of uncompensated time per week.

7.     I am aware that Chipotle's employee handbooks state that its policy is to compensate employees for all hours worked. Although this is Chipotle's stated policy, Chipotle's actual policy was to require employees to work off the clock. My manager made clear to me and other employees that we were expected us to work off the clock as

2

instructed, and that we risked discipline, including termination, if we asked to be paid for off-the-clock work. I and other Chipotle employees were all subjected to this same policy.

8.     I am aware that Chipotle has a complaint line, which Chipotle says can be used to make anonymous complaints.   Given that we were discouraged from either clocking back in, or from requesting to be paid for the time worked off the clock, I did not believe I could make a complaint without retaliation. Other employees who I talked to felt the same way.

9.     During my employment, I witnessed other current and/or former hourly-paid employees being subjected to the same treatment, in that they were routinely required to punch out while still working, or otherwise were not compensated by Chipotle for regular/straight time and/or overtime for the hours they worked off the clock.

I declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 26, 2015

_M Ford_
Markeitta Ford

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02612-JLK-CBS

LEAH TURNER, ARACELI GUTIERREZ, MARKEITTA FORD,
JOLESSA WADE, DANYA GRANADO, BRETT CHARLES, and
RUBY TSAO

individually and on behalf of others
similarly situated

Plaintiff,

v.

CHIPOTLE MEXICAN GRILL, INC.,

Defendant.

---

## DECLARATION OF RUBY TSAO

---

1.     I, Ruby Tsao, certify that I am over the age of eighteen years, that
the statements made in this Declaration are true and correct to the best of my
knowledge, and that I have personal knowledge of the statements made herein.

2.     I was employed by Defendant Chipotle Mexican Grill, Inc.
("Chipotle") as a non-exempt hourly paid Crew Member and Kitchen Manager in
Training from June 3, 2013 through September 2014. During this time I worked at
one of the Parker restaurants, located at 18320 Cottonwood Drive, Parker,
Colorado, 80138.

1


EXHIBIT
4

3.      While I was employed as a Crew Member and/or Kitchen Manager in Training I was involved in, preparing, serving and selling Chipotle food products, and perform other related tasks, including cleaning.

4.      During my employment with Chipotle, I was forced to work off the clock. My duties included cleaning the kitchen and fryers, cleaning the lobby areas and bathrooms, food preparation, and attending mandatory end-of-shift meetings. This time often exceeded several hours per week in addition to the hours for which I was paid.

5.      During my employment with Chipotle, I usually worked the night shift, or the morning shift.

6.      Anytime I was close to working 40 hours in a workweek I would be told to clock out and continue working.

7.      Additionally, I would be called in on my days off to work the morning shift, however I was not permitted to clock in if I was not "officially" on the schedule.

8.      I am aware that Chipotle's employee handbooks state that its policy is to compensate employees for all hours worked. Although this is Chipotle's stated policy, Chipotle's actual policy was to require employees to work off the clock. My manager made it clear to me and other employees that the company expected us to work off the clock as instructed to show dedication and commitment to the company, and that we risked discipline, including termination,

if we asked to be paid for off-the-clock work. I and other Chipotle employees were all subjected to this same policy.

9.    I am aware that Chipotle has a complaint line, which Chipotle says can be used to make anonymous complaints.  Given that we were discouraged from either clocking in, or from requesting to be paid for the time worked off the clock, I did not believe I could make a complaint without retaliation. Other employees who I talked to felt the same way.

10.    During my employment, I witnessed other current and/or former hourly-paid employees being subjected to the same treatment, in that they were routinely required to punch out while still working, or otherwise were not compensated by Chipotle for regular/straight time and/or overtime for the hours they worked off the clock.

I declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 28, 2015

Ruby Tsao

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02612-JLK-CBS

LEAH TURNER, ARACELI GUTIERREZ, MARKEITTA FORD,
JOLESSA WADE, DANYA GRANADO, BRETT CHARLES, and
RUBY TSAO

individually and on behalf of others
similarly situated,

Plaintiffs,

v.

CHIPOTLE MEXICAN GRILL, INC.,

Defendant.

---

## DECLARATION OF MARCUS HARRIS

1.      I, Marcus Harris, certify that I am over the age of eighteen years, that the

statements made in this Declaration are true and correct to the best of my knowledge, and

that I have personal knowledge of the statements made herein.  I am currently a named

plaintiff in the case captioned *Harris et al. v. Chipotle Mexican Grill, Inc.*, No. 13-cv-

0719 (D. Minn.).  I submit this Declaration in support of Plaintiffs' motion to

conditionally certify a collective in the above-captioned action.

2.      I was employed by Defendant Chipotle Mexican Grill, Inc. ("Chipotle")

from approximately January 14, 2013 until sometime in April, 2014.  I worked at the

Crystal restaurant located at 5608 West Broadway, Crystal, MN, 55428.



EXHIBIT

5

3.    I was employed by Chipotle as an hourly-paid crew member to prepare, serve and sell Chipotle food products, and perform other related tasks, including cleaning.

4.    During my employment with Chipotle, I was forced to work off the clock. My duties included cleaning the kitchen and fryers, cleaning the lobby areas and bathrooms, and attending mandatory end-of-shift meetings. This time often exceeded several hours per week in addition to the hours for which I was paid.

5.    During my employment with Chipotle, until the *Harris* Complaint was filed on July 2, 2013, I usually worked the night shift, which meant I was scheduled to work from approximately 4:00 p.m. until after the restaurant's closing time. Although the restaurant closed at 10:00 p.m., cleaning the fryers, lobby, bathrooms, kitchen, and other tasks almost always required that I and the other night shift employees work past the automatic "reset" that occurred every morning at 12:30 a.m. with the Aloha Point-of-Sale ("POS") system, which begins the next business day. I have not been fully and properly compensated for regular/straight time and/or overtime for the hours I worked off the clock.

6.    I am aware that Chipotle's employee handbooks state that its policy is to compensate employees for all hours worked. Although this is Chipotle's stated policy, Chipotle's actual policy was to require employees to work off the clock. Jose Ramirez and Filente Smith, the General Manager and Apprentice at the Crystal location, respectively, made it clear to me and other employees that the company expected us to finish our work by the 12:30 a.m. "reset," and that we risked discipline, including

2

termination, if we asked to be paid for time worked after the 12:30 a.m. "reset." I and other Chipotle employees were all subjected to this same policy.

7.      It was my understanding that we had to work off the clock so that budget goals could be met. Mr. Ramirez and Mr. Smith instructed me and others on my shift to punch out before 12:30 a.m., even if we continued working after we punched out. I was not allowed to punch back in after 12:30 a.m., or to obtain time punch edits to account for time I worked after I was punched out, because that would increase the restaurant's labor costs for the next business day.  As a result, time punch edits were only rarely done, if ever, to account for time I worked off the clock.

8.      Every night, everyone on the night shift left at the same time, because everyone had to attend a mandatory after-shift meeting after all cleanup and other work had been completed. This mandatory after-shift meeting always took place either right before, or right after, the security system was armed for the evening. There was almost always a significant gap between the time people clocked out, and the time they completed their work and the security system was armed for the evening. Night shift employees were not paid for this gap in time that they worked off the clock, which included not being paid for attending the mandatory after-shift meeting.

9.      Mr. Ramirez and Mr. Smith discouraged employees from either clocking back in, or from requesting to be paid for the time worked off the clock, by threatening to terminate us, or threatening to assign us tasks that would keep us at the restaurant even later than usual. Mr. Ramirez and Mr. Smith told us that if we could not get our work done by 12:30 a.m., they would "find people who could," or words to that effect. I also

3

recall Mr. Smith threatening us that if we asked to be punched back in after the 12:30 a.m. "reset," we would be required to stay even longer and do a "deep clean," which entailed cleaning the floorboards, the kitchen vents, and the refrigeration pegs and coils, and other extensive cleaning, to discourage us from making similar requests in the future.

10.     Whenever I complained about being required to work off the clock without compensation, I was subject to retaliation. Soon after I began working at Chipotle, I complained to Mr. Smith and Mr. Ramirez that I was not being paid for all hours worked. I specifically complained about having to clock out even though I was still working. I also complained that I was not being paid for the time worked after I was clocked out.

11.     The week after I complained, my scheduled hours were reduced from an average of about thirty-six hours per week, to about ten hours per week. Mr. Smith told me that I was not being a "team player," and that I needed to "change my attitude," or words to that effect.

12.     Over the next several weeks, my hours were gradually restored to their previous level. I learned not to complain about being required to work off the clock.

13.     I am aware that Chipotle has a complaint line, which Chipotle says can be used to make anonymous complaints. Given what happened when I did complain, I did not believe I could make a complaint without retaliation. Other employees who I talked to felt the same way.

14.     Chipotle continued to retaliate against me for complaining about being forced to work off the clock without compensation. For example, shortly after the *Harris* Complaint was filed on July 2, 2013, I was taken off the night shift, and my hours were

4

cut again. Although I was hired to work full time, my hours were cut to under ten per week. I complained about this repeatedly to Mr. Ramirez, but my hours were not restored. As a result, I was forced to get another job to make up for the hours I lost at Chipotle. Mr. Ramirez would not tell me why my hours were cut, but I believe it was in retaliation for bringing an action against Chipotle.

15.     Also, after the *Harris* action was filed, I was harassed by Chipotle's managers. For example, on September 29, 2013, Mr. Smith told me that people were saying there was "a rumor going around" that I could not be terminated for filing a wage and hour action against Chipotle. I denied starting this "rumor" (although I did believe I could not be terminated for filing a wage and hour action against Chipotle). Nevertheless, Mr. Smith wrote me up for the rumor and threatened me with termination if the "rumor" continued. See Exhibit A hereto.

16.     Moreover, one day in August, 2013, after the *Harris* lawsuit was filed, Alex Barbon, a Service Manager, shouted at me, knocked a pan out of my hand, and called me a "nigger." On or about October 15, 2013, Jose Hernandez, a Kitchen Manager who submitted a Declaration on behalf of Chipotle in the *Harris* matter, called me a "bitch." When I complained to Mr. Ramirez, his response was not to discipline Mr. Barbon or Mr. Hernandez, but to schedule me during times when they were not working.

17.     During my employment, I witnessed other current and/or former hourly-paid employees at the Crystal location being subjected to the same treatment, in that they were routinely required to punch out while still working, were not allowed to punch back in or were not given a time punch edit, and were not compensated by Chipotle for

regular/straight time and/or overtime for the hours they worked off the clock. These current and/or former hourly-paid employees include Julius Caldwell, Andrew Waribka, Dante Massey, Katrina Londo, Jayson Beebe, Alan Hawkins, DeMarkus Hobbs, Brian Thompson, Ryan Cox, Andrew Craig, Terrance Evans, Derek Jones, Brian Janes, and others.

18.     I believe that hourly-paid Chipotle employees at other Chipotle locations have also been subjected to this same treatment, based on conversations I have had with a woman named Camilia from the Brooklyn Park restaurant located at 7631 Jolly Lane, Minneapolis, Minnesota, who told me that she and others were required to work off the clock, without compensation.

I declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 26, 2014

_Marcus Harris_
Marcus Harris

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02612-JLK-CBS

LEAH TURNER, ARACELI GUTIERREZ, MARKEITTA FORD,
JOLESSA WADE, DANYA GRANADO, BRETT CHARLES, and
RUBY TSAO

individually and on behalf of others
similarly situated,

Plaintiffs,

v.

CHIPOTLE MEXICAN GRILL, INC.,

Defendant.

---

## DECLARATION OF JULIUS CALDWELL

1.      I, Julius Caldwell, certify that I am over the age of eighteen years, that the statements made in this Declaration are true and correct to the best of my knowledge, and that I have personal knowledge of the statements made herein.  I am currently a named plaintiff in the case captioned *Harris et al. v. Chipotle Mexican Grill, Inc.*, No. 13-cv-0719 (D. Minn.).  I submit this Declaration in support of Plaintiffs' motion to conditionally certify a collective in the above-captioned action.

2.      I was employed by Defendant Chipotle Mexican Grill, Inc. ("Chipotle") as a non-exempt, hourly-paid employee from approximately April 1, 2012 until June 10, 2013.  During this time I worked at the Crystal restaurant, located at 5608 West Broadway, Crystal, MN, 55428.



EXHIBIT

6

3.     I was employed by Chipotle as a non-exempt hourly-paid Crew Member from April 1, 2012 until approximately October 1, 2012, preparing, serving and selling Chipotle food products, and performing other related tasks, including cleaning.

4.     I was employed by Chipotle as a non-exempt hourly-paid Kitchen Manager from approximately October 1, 2012 until approximately December 7, 2012, ordering food products and kitchen supplies, preparing, serving and selling Chipotle food products, and performing other related tasks, including cleaning.

5.     I was employed by Chipotle as a non-exempt hourly paid Service Manager from approximately December 7, 2012 through June 10, 2013, supervising Crew Members and Kitchen Managers, hiring employees, training employees, preparing, serving and selling Chipotle food products, and performing other related tasks, including cleaning.

6.     Throughout my employment at Chipotle, I and other employees were often required to work after closing without pay. The duties included cleaning the kitchen and fryers, cleaning the lobby areas and bathrooms, and attending mandatory end-of-shift meetings. This time often exceeded several hours per week in addition to the hours for which I was paid.

7.     During my employment with Chipotle, as both a Crew Member and as a Service Manager, I usually worked the night shift, which meant I was scheduled to work from approximately 4:00 p.m. until after the restaurant's closing time. Although the restaurant closed at 10:00 p.m., cleaning the fryers, lobby, bathrooms, kitchen, and other tasks almost always required that I and the other night shift employees work past the

2

automatic "reset" that occurred every morning at 12:30 a.m. with the Aloha Point-of-Sale

("POS") system, which begins the next business day. I have not been fully and properly

compensated for regular/straight time and/or overtime for the hours I worked off the

clock.

      8.     I am aware that Chipotle's employee handbooks state that its policy is to

compensate employees for all hours worked. Although this is Chipotle's stated policy,

Chipotle's actual policy was to require employees to work off the clock. Jose Ramirez

and Filente Smith, the General Manager and Apprentice at the Crystal location,

respectively, made it clear to me and other employees that the company expected us to

finish our work by the 12:30 a.m. "reset," and that we risked discipline, including

termination, if we asked to be paid for time worked after the 12:30 a.m. "reset." I and

other Chipotle employees were all subjected to this same policy.

      9.     It was my understanding that we had to work off the clock so that budget

goals could be met. The Aloha POS system set the labor budget for each business day,

based on the projected revenue for that day. Throughout each business day, the Aloha

POS system kept track of the day's labor costs and revenue. At any point during the day,

the Aloha POS system could generate a number that told us whether we were on track for

the day. Mr. Ramirez and Mr. Smith constantly checked to make sure that the day's labor

costs were not exceeding desired levels compared to the day's revenue. To attain labor

budget goals, night shifts were almost always understaffed, so that we could not get all of

our assigned work done before the 12:30 a.m. "reset." This required people to work off

the clock, or the work would not get done.

10.    Mr. Ramirez and Mr. Smith, however, did not want employees to be automatically clocked out at 12:30 a.m., because it implied that people were still working, and continuing to work, past that time. To avoid that implication, Mr. Ramirez and Mr. Smith instructed me and others on my shift to punch out no later than a few minutes before 12:30 a.m., even if we continued working after we punched out. As a Service Manager, I was also instructed not to let people punch back in after 12:30 a.m., or to do time punch edits to account for time they worked after they punched out, because that would increase the restaurant's labor costs. As a result, time punch edits were only rarely done, if at all, to account for time worked off the clock.

11.    Every night, everyone on the night shift left at the same time, because everyone had to attend a mandatory after-shift meeting after all cleanup and other work had been completed. This mandatory after-shift meeting always took place either right before, or right after, the security system was armed for the evening. There was almost always a significant gap between the time people clocked out, and the time they completed their work and the security system was armed for the evening. Night shift employees were not paid for this gap in time that they worked off the clock, which included not being paid for attending the mandatory after-shift meeting.

12.    Mr. Ramirez and Mr. Smith discouraged employees from either clocking back in, or from requesting to be paid for the time worked off the clock, by cutting our hours, terminating us, or threatening to assign us tasks that would keep us at the restaurant even later than usual. It was widely known that Marcus Harris had his hours cut when he complained about being forced to work off the clock without compensation.

Mr. Ramirez and Mr. Smith also told us that if we could not get our work done by 12:30 a.m., they would "find people who could," or words to that effect. I also recall Mr. Smith telling me and other Service Managers that if employees asked to be punched back in after the 12:30 a.m. "reset," we should make them stay even longer and do a "deep clean," which entailed cleaning the floorboards, the kitchen vents, and the refrigeration pegs and coils, and other extensive cleaning, to discourage employees from making similar requests in the future.

13.     During my employment, I witnessed other current and/or former employees at the Crystal location being subjected to the same treatment, in that they were routinely required to punch out while still working, were not allowed to punch back in or were not given a time punch edit, and were not compensated by Chipotle for regular/straight time and/or overtime for the hours they worked off the clock. These current and/or former employees include Marcus Harris, Andrew Waribka, Dante Massey, Katrina Londo, Jayson Beebe, Miguel Ceron, Alan Hawkins, DeMarkus Hobbs, Brian Thompson, Ryan Cox, Andrew Craig, Terrance Evans, Derek Jones, Jesus Juarez Reyes, Brian Janes, and others.

14.     I believe that Chipotle employees at other Chipotle locations have also been subjected to this same treatment, based on conversations I have had with women named Maria and Shay at the Brooklyn Park restaurant located at 7631 Jolly Lane, Minneapolis, Minnesota, both of whom told me that they and others were required to work off the clock after 12:30 a.m., without compensation.

I declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 26, 2014.

Julius Caldwell

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02612-JLK-CBS

LEAH TURNER, ARACELI GUTIERREZ, MARKEITTA FORD,
JOLESSA WADE, DANYA GRANADO, BRETT CHARLES, and
RUBY TSAO

individually and on behalf of others
similarly situated,

Plaintiffs,

v.

CHIPOTLE MEXICAN GRILL, INC.,

Defendant.

---

### DECLARATION OF DESHANDRE WOODARDS

1.      I, DeShandre Woodards, certify that I am over the age of eighteen years,
that the statements made in this Declaration are true and correct to the best of my
knowledge, and that I have personal knowledge of the statements made herein.  I am
currently the named plaintiff in the case captioned *Woodards et al. v. Chipotle Mexican
Grill, Inc.*, No. 14-cv-04181 (D. Minn.).  I submit this Declaration in support of
Plaintiffs' motion to conditionally certify a collective in the above-captioned action.

2.      I was employed by Defendant Chipotle Mexican Grill, Inc. ("Chipotle")
from approximately October 2011 to August 2012.  I worked at the Chipotle restaurant
located at 515 Winnetka Ave. N., Golden Valley, MN 55427.



EXHIBIT

7

3.      I was employed by Chipotle as an hourly-paid crew member to prepare, serve and sell Chipotle food products, and perform other related tasks, including cleaning.

4.      During my employment with Chipotle, I worked both the day and the night shift, depending on the schedule.  During the day, I was generally scheduled from 8:00 a.m. until 4:00 p.m.  At night, I was usually scheduled from 4:00 p.m. to 10:00 p.m.  I generally was scheduled for a total of thirty-five (35) to forty (40) hours per week.

5.      I have not been fully and properly compensated for all the hours I worked at Chipotle.  On day shifts, I was occasionally instructed to continue working after the end of my scheduled shift, even though I was clocked out.  I was not allowed to clock back in, even though I was still working. On night shifts, although my shift was scheduled to end when the restaurant closed at 10:00 p.m., I was required to help clean the fryers, lobby, bathrooms, kitchen, and perform other tasks after the store closed. This often required that I and all of the other night shift employees work into the morning, even past the 12:30 a.m. "reset," until all of the tasks were completed.  We were usually instructed to clock out during all  or part of this time, and if we did not, we were automatically clocked out by the 12:30 a.m. "reset" of the POS system. We were not allowed to clock back in after the "reset," even though we were still working.

6.      My off-the-clock duties included cleaning the kitchen and fryers, cleaning the lobby areas and bathrooms, doing dishes, and attending meetings. This generally added up to ten to fifteen hours of uncompensated time per week.

2

7.      I am aware that Chipotle's employee handbooks state that its policy is to compensate employees for all hours worked. Although this is Chipotle's stated policy, Chipotle's actual policy was to require employees to work off the clock. My manager made it clear to me and other employees that the company expected us to work off the clock as instructed.   I and other Chipotle employees were all subjected to this same policy.

8.      I am aware that Chipotle has a complaint line, which Chipotle says can be used to make anonymous complaints.   Given that we were discouraged from either clocking back in, or from requesting to be paid for the time worked off the clock, I did not believe I could make a complaint without retaliation. Other employees who I talked to felt the same way.

9.      During my employment, I witnessed other current and/or former hourly-paid employees being subjected to the same treatment, in that they were routinely required to punch out while still working, or otherwise were not compensated by Chipotle for regular/straight time and/or overtime for the hours they worked off the clock.

I declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 27, 2014

DeShandre Woodards

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02612-JLK

LEAH TURNER, ARACELI GUTIERREZ, MARKEITTA FORD, JOLESSA WADE, DANYA GRANADO, BRETT CHARLES, and RUBY TSAO,

individually and on behalf of others
similarly situated,

Plaintiffs,

v.

CHIPOTLE MEXICAN GRILL, INC.,

Defendant.

---

### DECLARATION OF FLINTE SMITH

1.      I, Flinte Smith, certify that I am over the age of eighteen years, that the statements made in this Declaration are true and correct to the best of my knowledge, and that I have personal knowledge of the statements made herein.  I submit this Declaration in support of Plaintiffs' motion to conditionally certify a collective in the above-captioned action.

2.      I was employed by Chipotle from approximately July of 2011 to August of 2014 at the restaurant located at 5608 West Broadway, Crystal, MN, 55428.  I was initially hired as a crew member, but was soon promoted to Kitchen Manager in Training, then Kitchen Manager, and then Service Manager. In January of 2012 I was promoted to the position of Apprentice Manager, which is a


EXHIBIT

salaried position. I held that position until October of 2013, when I was promoted to the position of General Manager at the Brooklyn Park location at 7631 Jolly Lane, Brooklyn Park, MN 55428.

3.      The Crystal location is part of a "Patch" of Chipotle restaurants made up of the Crystal, Minnetonka, St. Louis Park, Northtown Mall, Coon Rapids, Arbor Lakes, Brooklyn Park, and Downtown Sixth Street locations. During most of my time as Apprentice Manager at the Crystal location, we were known as the "Patet Patch," because our Patch Leader was Todd Patet.

4.      The Patet Patch was part of a larger "Area" comprised of all Chipotle restaurants in Minnesota, which totaled nearly 50 stores by the time I left Chipotle in August of 2014. Included in the Minnesota Area were all of the restaurants in our Patch, plus restaurants in Cottage Grove, Blaine, Edina, Apple Valley, Bloomington, Downtown Minneapolis, Woodbury, Oak Park Heights, Eagan, West St. Paul, Richfield, St. Paul, Maplewood, Shoreview, Roseville, and Rochester. The leader of the Minnesota Area was Travis Moe.

5.      The Minnesota Area was part of the Central Region, comprised of Minnesota, Illinois, Wisconsin, Michigan, Indiana, Ohio, Kentucky, and Toronto. Until approximately April of 2014, the Director of the Central Region was Michelle Small. After Ms. Small retired, Travis Moe was given Team Director responsibility for Minnesota, Todd Patet was promoted to Area Manager for Minnesota, and Alex Cortes was promoted to Patch Leader for our Patch.

6.     As an Apprentice Manager, I often attended half-day Patch and Area meetings, generally held about twice each quarter. The Patch meetings were attended by Mr. Patet and the Apprentice and General Managers in our Patch, and were held at one of the restaurants in our Patch. The Area meetings were attended by Mr. Moe, Mr. Patet and other Patch Leaders, along with the Apprentice and General Managers for restaurants in the Minnesota Area; Ms. Small also occasionally attended Minnesota Area meetings. The Area meetings were always held at Chipotle's downtown offices in the AT&T Tower, located at 901 Marquette Avenue, Minneapolis, Minnesota, 55402.

7.     During Patch and Area meetings, Apprentice and General Managers talked openly about the need for hourly employees to work off the clock to keep down labor costs, while maintaining Chipotle service and cleanliness standards. For example, we talked about ways to secure the attendance of crew members at overnight "cleaning parties" without paying wages, such as using petty cash to buy snacks. We also talked about the need to clock out night shift crew members before 12:30 a.m. to avoid any record of working through the 12:30 a.m. "reset," and requiring crew members to continue working off the clock, without pay, until their work was completed. And, we expressed our concern about the unfairness of requiring employees to work off the clock without pay.

8.     Mr. Moe, Mr. Patet, and other Patch Leaders were present during these conversations. When they heard us complain about the unfairness of making people work off the clock, they would say things like, "We aren't forcing you to

3

do anything, but you need to do whatever it takes to keep your labor costs down," or words to that effect. We interpreted this to mean that, although Chipotle's stated policy is to pay for every hour worked, Chipotle's actual policy is to require off-the-clock work as needed to keep labor costs under control.

9.       Chipotle requires hourly-paid crew members to work off the clock to meet budget goals, and because bonuses and performance reviews for General Managers are based in part upon labor costs. Store budgets and prospective sales are set centrally via Chipotle's corporate, centralized, uniform, computerized Aloha POS system, not by the individual store managers or at a restaurant-by-restaurant or even region-by-region level. The Aloha POS system sets the amounts of sales and labor costs that each store needs to meet every day. If a store does not fall within this preset "matrix," managers are at risk for losing their jobs.

10.       Throughout the day, the Aloha POS system keeps track of the day's revenue and labor costs. At any point during the day, the Aloha POS system can generate a number that shows whether the revenue and labor cost "matrix" was on track for the day. As an Apprentice Manager, I was required to check the day's matrix several times per shift. Jose Ramirez, the General Manager, Mr. Cortes, and Mr. Patet would call regularly to make sure we were keeping our labor costs in line with our revenue for the day.

11.       Due to Chipotle's desire to keep down labor costs, shifts were often understaffed. Night shifts were usually so understaffed that we could not get all of our work done before the 12:30 a.m. "reset." I was directed to clock out hourly-

paid night shift crew members before 12:30 a.m., to avoid an inference of working through the 12:30 a.m. reset. Crew members were still required to keep working after they were clocked out.

12.     I am aware that several workers from the Crystal location filed a lawsuit alleging that Chipotle has a single, uniform policy of requiring hourly employees to work off the clock, without pay.   Based on my experience at Chipotle, including my attendance at Patch and Area meetings, I believe this allegation is accurate. Every Apprentice and General Manager I have spoken to about the issue has admitted that they routinely require off-the-clock work.

13.     In August of 2014, Travis Moe required that I sign a document stating that I acted alone in directing employees to work off the clock, without anyone's else's approval or knowledge. Although Mr. Moe, Mr. Patet and others may not have been aware of the specific instances in which Crystal employees were told to work off the clock, I believe these gentlemen were generally aware that Apprentice and General Managers at Chipotle restaurants throughout Minnesota routinely require off-the-clock work. My belief is based on their attendance at Area and Patch meetings where this was openly discussed, their instructions that we must "do whatever it takes" to keep labor costs down, and their close monitoring of labor costs at locations within their responsibility.

Dated: January 31, 2015

Flinte Smith

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-00794-WYD

LEAH TURNER, individually and on behalf of others similarly
situated,

Plaintiff,

v.

CHIPOTLE MEXICAN GRILL OF COLORADO, LLC,

Defendant.

---

**PLAINTIFF'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

---

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff, Leah Turner,

answers the following interrogatories.

### GENERAL OBJECTIONS

The following general objections ("General Objections") are made as to each and every

discovery request and may not be repeated as to any specific request listed below, even though

additional objections may also be asserted.

1.      Plaintiff objects to Defendant's discovery requests to the extent they seek

information or documents that are protected from disclosure by any privilege or immunity,

including the attorney-client privilege, the work product doctrine, or any other privilege, doctrine

or immunity available by law. To the extent Defendant's discovery requests can be construed to

seek privileged or protected documents or information, Plaintiff asserts said privilege or

1



protection, objects to the request, and will provide only non-privileged, non-protected documents or information, if any.

2.     Plaintiff objects to Defendant's discovery requests to the extent that they seek to impose duties or burdens on Plaintiff that are inconsistent with or in addition to those required by the Federal Rules of Civil Procedure. To the extent there is any inconsistency between a particular request and the Rules, Plaintiff will comply with the Rules.

3.     Plaintiff objects to Defendant's discovery requests to the extent they seek information that is neither relevant to the parties' claims or defenses in the pending action, nor reasonably calculated to lead to the discovery of admissible evidence.

4.     Plaintiff objects to Defendant's discovery requests to the extent they are vague, ambiguous, overly broad, unreasonably cumulative or duplicative, or to the extent that compliance with the Defendant's discovery requests would be unduly burdensome or oppressive.

5.     Plaintiff objects to the Defendant's discovery requests to the extent they contain multiple subparts and/or multiple requests such that Plaintiffs exceed the number of requests to which they are entitled pursuant to Scheduling Order.

6.     Plaintiff objects to Defendant's discovery requests to the extent that they seek materials or information already known to or in the possession of Defendant.

7.     In responding to Defendant's discovery requests, Plaintiff does not waive, nor intend to waive, any privilege or objection, including but not limited to, any objection to the relevancy, materiality, or admissibility of any of its responses or the subject matter addressed therein.

8.     No incidental or implied admissions are intended by the responses herein. The fact that Plaintiff has answered part or all of any request contained in the Defendant's discovery

requests is not intended to be, and shall not be construed as, a waiver by Plaintiff of any part of any objection to any Defendant's discovery requests.

9.      Plaintiff has not yet completed investigations and/or analysis of matters relating to this case, and has not yet completed discovery in preparation for trial. Accordingly, Plaintiff reserves the right to modify, amend or supplement these responses to Defendant's discovery requests based upon information learned during discovery, continued legal analysis, and/or through expert analysis.

10.     Plaintiff objects to the "Definitions" sections in Defendant's discovery requests to the extent the Definitions purport to impose upon Plaintiff any duties or obligations beyond those imposed by the Federal Rules of Civil Procedure. To the extent there is any inconsistency between Plaintiffs' Definitions and the Rules, Plaintiff will comply with the Rules.

## RESPONSES TO INTERROGATORIES
### INTERROGATORY NO. 1:

Identify by name and position any individual You claim directed, permitted, required, authorized or otherwise instructed You to "clock out" and continue working without recording Your time worked.

**ANSWER**: Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Plaintiff responds as follows:

Alejandra Garcia, General Manager; Serena Crabtree, Area Manager; and Augustine, Apprentice.

### INTERROGATORY NO. 2:

Identify by name and position any individual You claim witnessed You being directed, permitted, required or otherwise instructed to "clock out" and continue working without recording Your time worked.

**ANSWER**: Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Plaintiff responds as follows:

Alejandra, General Manager, who made me clock out and work. Britany Link, KM/SM; Meagan LNU, Service Manager; Josh LNU, employee; Jose LNU, employee; Agustin LNU, apprentice; Jenny LNU; and most employees working that period.

## INTERROGATORY NO. 3:

Identify by name and position any individual You claim was aware of or informed of You being directed, permitted, required or otherwise instructed to "clock out" and continue working without recording Your time worked.

**ANSWER**: Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Plaintiff responds as follows:

Alejandra, General Manager; Britany Link, KM/SM; Meagan LNU, Service Manager; Josh LNU, employee; and Jose LNU, employee.


## INTERROGATORY NO. 4:

If You claim that any individual was acting pursuant to a custom, practice or policy of Chipotle in directing, permitting, requiring or otherwise instructing You to "clock out" and continue working without recording Your time worked, describe each and every such custom, practice or policy.


**ANSWER**:  Plaintiff incorporates herein by reference the General Objections listed above.  Additionally, Plaintiff objects as this Interrogatory is overly broad and unduly burdensome. *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649 (10th Cir. 2008) (request for all information related to "the litigation or the allegations, facts and circumstances concerning the litigation" was overly broad and not stated with "reasonable particularity" as required by Rule 34(b)(1)(A)); *see also IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) ("To require specifically 'each and every' fact, however, would too often require a laborious, time consuming analysis, search, and description of incidental, secondary, and perhaps irrelevant and trivial details. The burden to answer then outweighs the benefit to be gained. Other discovery procedures, such as depositions and production of documents, better address whatever need there be for that kind of secondary detail."). Further, courts condemn "blockbuster" interrogatories: "at some point a reasonable limit against indiscriminately hurling interrogatories at every conceivable detail and fact which may relate to a case . . . . Indiscriminate use of blockbuster interrogatories, such as these, do not comport with the just, speedy, and inexpensive determination of the action. To require answers to them would more likely cause delay and unreasonable expense of time, energy, and perhaps money."). *Grynberg v. Total S.A.*, 2006 WL 1186836 (D. Colo. 2006). Plaintiff objects to the Request to the extent it seeks information that is

4

protected by the attorney-client privilege or work product doctrine. Moreover, the Plaintiff objects to this interrogatory as vague and ambiguous to the extent that the term "policy" is undefined; therefore the Plaintiff is left to guess at the Defendant's meaning of the term and if it is meant to describe written policies and procedures, policies and procedures that were verbal, and/or policies and procedures over multiple locations. Due to the lack of a clear definition the Plaintiff cannot properly respond to this interrogatory because it is impossible for her to guess the meaning of this term and/or phrase.

Without waiving and subject to these objections Plaintiff responds to the best of his recollection as follows:

I was instructed by my supervisor, Alejandra Garcia, on a weekly basis to clock out when I was at or close to 40 hours. She made me change my own hours or she changed them for me. She edited my time on a weekly basis and added hours from one week to the next to avoid overtime. I was made to clock out and continue to work off the clock every week.

## INTERROGATORY NO. 5:

Identify by name and position any individual You claim redistributed, reallocated, reposted, reapportioned or otherwise adjusted hours You worked with the effect of depriving You of payment for all hours worked or all overtime hours worked.

**ANSWER:** Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Plaintiff responds as follows:

Alejandra Garcia, General Manager; Britany Link, KM/SM; Meagan LNU, Service Manager; Agustin LNU, apprentice.

## INTERROGATORY NO. 6:

Identify by name and position any individual You claim witnessed Your hours worked being redistributed, reallocated, reposted, reapportioned or otherwise adjusted with the effect of depriving You of payment for all hours worked or all overtime hours worked.

**ANSWER:** Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Plaintiff responds as follows:

Alejandra, General Manager, the person who made me clock out and work. Britany Link, KM/SM; Meagan LNU, Service Manager; Josh LNU, employee; Jose LNU, employee; Agustin LNU, apprentice; Jenny LNU; and most employees working that period.

## INTERROGATORY NO. 7:

Identify by name and position any individual You claim was aware of or informed of any redistribution, reallocation, reposting, reapportionment or other adjustment of hours You worked with the effect of depriving You of payment for all hours worked or all overtime hours worked.

**ANSWER**: Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Plaintiff responds as follows:

Alejandra, General Manager, the person who made me clock out and work. Britany Link, KM/SM; Meagan LNU, Service Manager; Josh LNU, employee; Jose LNU, employee; Agustin LNU, apprentice; Jenny LNU; and most employees working that period.

## INTERROGATORY NO. 8:

If You claim that any individual was acting pursuant to a custom, practice or policy of Chipotle in redistributing, reallocating, reposting, reapportioning or otherwise adjusting hours You worked with the effect of depriving You of payment for all hours worked or all overtime hours worked, describe each and every such custom, practice or policy.

**ANSWER**:   Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Additionally, Plaintiff objects as this Interrogatory is overly broad and unduly burdensome. *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649 (10th Cir. 2008) (request for all information related to "the litigation or the allegations, facts and circumstances concerning the litigation" was overly broad and not stated with "reasonable particularity" as required by Rule 34(b)(1)(A)); *see also IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) ("To require specifically 'each and every' fact, however, would too often require a laborious, time consuming analysis, search, and description of incidental, secondary, and perhaps irrelevant and trivial details. The burden to answer then outweighs the benefit to be gained. Other discovery procedures, such as depositions and production of documents, better address whatever need there be for that kind of secondary detail.").   Further, courts condemn "blockbuster" interrogatories: "at some point a reasonable limit against indiscriminately hurling interrogatories at every conceivable detail and fact which may relate to a case . . . . Indiscriminate use of blockbuster interrogatories, such as these, do not comport with the just, speedy, and inexpensive determination of the action. To require answers to them would more likely cause delay and unreasonable expense of time, energy, and perhaps money."). *Grynberg v. Total S.A.*, 2006 WL 1186836 (D. Colo. 2006).  Plaintiff objects to the Request to the extent it seeks information that is protected by the attorney-client privilege or work

product doctrine. Moreover, the Plaintiff objects to this interrogatory as vague and ambiguous to the extent that the term "policy" is undefined; therefore the Plaintiff is left to guess at the Defendant's meaning of the term and if it is meant to describe written policies and procedures, policies and procedures that were verbal, and/or policies and procedures over multiple locations. Due to the lack of a clear definition the Plaintiff cannot properly respond to this interrogatory because it is impossible for her to guess the meaning of this term and/or phrase.

Without waiving and subject to these objections Plaintiff responds to the best of his recollection as follows:

On a regular basis I was forced to clock out after 40 hours. Additionally, my time improperly changed prior to being sent to payroll, whereby overtime hours worked during one week would be recorded as normal non-overtime hours worked in the following week. This resulted in improper time keeping as my overtime hours were not reflected and therefore I did not receive the overtime pay that I was entitled to receive.

## INTERROGATORY NO. 9:

Identify by name and date any holiday for which You claim You were not properly paid by Chipotle.

**ANSWER:**  Plaintiff incorporates herein by reference the General Objections listed above.

Without waiving and subject to these objections Plaintiff responds as follows:

Christmas, 2010 and Easter, 2010

## INTERROGATORY NO. 10:

If You claim that you were not properly paid for any holiday pursuant to a custom, practice or policy of Chipotle, describe each and every such custom, practice or policy.

**ANSWER**:   Plaintiff incorporates herein by reference the General Objections listed above. Additionally, Plaintiff objects as this Interrogatory is overly broad and unduly burdensome. *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649 (10th Cir. 2008) (request for all information related to "the litigation or the allegations, facts and circumstances concerning the litigation" was overly broad and not stated with "reasonable particularity" as required by Rule 34(b)(1)(A)); *see also IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) ("To require specifically 'each and every' fact, however, would too often require a laborious, time consuming analysis, search, and description of incidental, secondary, and perhaps irrelevant and trivial details. The burden to answer then outweighs the benefit to be gained. Other discovery procedures, such as depositions and production of documents, better address whatever need there be for that kind of secondary detail."). Further, courts condemn "blockbuster" interrogatories: "at some point a reasonable limit against indiscriminately hurling interrogatories at every conceivable

detail and fact which may relate to a case . . . . Indiscriminate use of blockbuster interrogatories, such as these, do not comport with the just, speedy, and inexpensive determination of the action. To require answers to them would more likely cause delay and unreasonable expense of time, energy, and perhaps money."). *Grynberg v. Total S.A.,* 2006 WL 1186836 (D. Colo. 2006). Plaintiff objects to the Request to the extent it seeks information that is protected by the attorney-client privilege or work product doctrine. Moreover, the Plaintiff objects to this interrogatory as vague and ambiguous to the extent that the term "policy" is undefined; therefore the Plaintiff is left to guess at the Defendant's meaning of the term and if it is meant to describe written policies and procedures, policies and procedures that were verbal, and/or policies and procedures over multiple locations. Due to the lack of a clear definition the Plaintiff cannot properly respond to this interrogatory because it is impossible for her to guess the meaning of this term and/or phrase.

Without waiving and subject to these objections Plaintiff responds to the best of his recollection as follows:

I worked on holidays when the store was closed and never was paid. I worked off the clock. I worked on mandatory days off for holidays. I was threatened with my job multiple times and not just on this subject.

## INTERROGATORY NO. 11:

Identify by name and position any current or former Chipotle employee to whom You communicated by any means any complaint, concern, objection, or issue of any kind Relating To not being paid by Chipotle for all hours worked or all overtime hours worked.

**ANSWER**: Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Plaintiff responds as follows:

Alejandra, General Manager, one who made me clock out and work. Britany Link, KM/SM; Meagan LNU, Service Manager; Josh LNU, employee; Jose LNU, employee; Agustin, apprentice; Jenny V., employee and most employees working that period.

## INTERROGATORY NO. 12:

Describe in detail each and every step, measure, or effort of any kind that You claim to have taken or made in order to obtain payment from Chipotle for any allegedly unpaid hours worked or overtime hours worked.

**ANSWER**: Plaintiff incorporates herein by reference the General Objections listed above. Additionally, Plaintiff objects as this Interrogatory is overly broad and unduly burdensome. *See Regan-Touhy v. Walgreen Co.,* 526 F.3d 641, 649 (10th Cir. 2008) (request for all information

related to "the litigation or the allegations, facts and circumstances concerning the litigation" was overly broad and not stated with "reasonable particularity" as required by Rule 34(b)(1)(A)); *see also IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) ("To require specifically 'each and every' fact, however, would too often require a laborious, time consuming analysis, search, and description of incidental, secondary, and perhaps irrelevant and trivial details. The burden to answer then outweighs the benefit to be gained. Other discovery procedures, such as depositions and production of documents, better address whatever need there be for that kind of secondary detail."). Further, courts condemn "blockbuster" interrogatories: "at some point a reasonable limit against indiscriminately hurling interrogatories at every conceivable detail and fact which may relate to a case . . . . Indiscriminate use of blockbuster interrogatories, such as these, do not comport with the just, speedy, and inexpensive determination of the action. To require answers to them would more likely cause delay and unreasonable expense of time, energy, and perhaps money."). *Grynberg v. Total S.A.*, 2006 WL 1186836 (D. Colo. 2006). Plaintiff objects to the Request to the extent it seeks information that is protected by the attorney-client privilege or work product doctrine.

Without waiving and subject to these objections Plaintiff responds to the best of his recollection as follows:

I told Alejandra it was not fair. I complained to Britany and Megan. I told the area manager and I was threatened with my job if I went higher up. I was promised by Alejandra that all would be fixed, but it never was fixed. Ultimately, I needed to retain an attorney, file a lawsuit and am still attempting to obtain the money that was improperly withheld.

**INTERROGATORY NO. 13:**

Describe in detail each and every reason that You claim You were not able to take a step,

measure, or effort in order to obtain payment from Chipotle for any allegedly unpaid hours worked or

overtime hours worked.

**ANSWER**: Plaintiff incorporates herein by reference the General Objections listed above. Additionally, Plaintiff objects as this Interrogatory is overly broad and unduly burdensome. *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649 (10th Cir. 2008) (request for all information related to "the litigation or the allegations, facts and circumstances concerning the litigation" was overly broad and not stated with "reasonable particularity" as required by Rule 34(b)(1)(A)); *see also IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) ("To require specifically 'each and every' fact, however, would too often require a laborious, time consuming analysis, search, and description of incidental, secondary, and perhaps irrelevant and trivial details. The burden to answer then outweighs the benefit to be gained. Other discovery procedures, such as depositions and production of documents, better address whatever need there be for that kind of secondary detail."). Further, courts condemn "blockbuster" interrogatories: "at some point a reasonable limit against indiscriminately hurling interrogatories at every conceivable

detail and fact which may relate to a case . . . . Indiscriminate use of blockbuster interrogatories, such as these, do not comport with the just, speedy, and inexpensive determination of the action. To require answers to them would more likely cause delay and unreasonable expense of time, energy, and perhaps money."). *Grynberg v. Total S.A.*, 2006 WL 1186836 (D. Colo. 2006). Plaintiff objects to the Request to the extent it seeks information that is protected by the attorney-client privilege or work product doctrine.

Without waiving and subject to these objections Plaintiff responds to the best of his recollection as follows:

I was constantly threatened with my job and told I would not get my promotion or get my own store if I continued to complain or if I complained to anyone else. I did not want to lose my job so I just did what I was told. I reported it to the Area Manager and I was told to just do as I was told if I wanted to keep my job and get my own store. I was told I had to go above and beyond to show I wanted my job.

## INTERROGATORY NO. 14:

Describe in detail each and every reason that You claim You were not able to file Your

Complaint prior to March 27, 2013.

**ANSWER:** Plaintiff incorporates herein by reference the General Objections listed above. Additionally, Plaintiff objects because this interrogatory specifically calls for information which constitutes attorney-client privilege and work product, including conversations with Plaintiff's attorney regarding her claims and the attorney's decisions related to the filing of a Complaint.

## INTERROGATORY NO. 15:

Describe each and every task You claim You completed during time for which You claim

You were not compensated during Your employment with Chipotle.

**ANSWER:** Plaintiff incorporates herein by reference the General Objections listed above. Additionally, Plaintiff objects as this Interrogatory is overly broad and unduly burdensome. *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649 (10th Cir. 2008) (request for all information related to "the litigation or the allegations, facts and circumstances concerning the litigation" was overly broad and not stated with "reasonable particularity" as required by Rule 34(b)(1)(A)); *see also IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) ("To require specifically 'each and every' fact, however, would too often require a laborious, time consuming analysis, search, and description of incidental, secondary, and perhaps irrelevant and trivial details. The burden to answer then outweighs the benefit to be gained. Other discovery procedures, such as depositions and production of documents, better address whatever need there be for that kind of secondary detail."). Further, courts condemn "blockbuster" interrogatories: "at some point a reasonable limit against indiscriminately hurling interrogatories at every conceivable

detail and fact which may relate to a case . . . . Indiscriminate use of blockbuster interrogatories, such as these, do not comport with the just, speedy, and inexpensive determination of the action. To require answers to them would more likely cause delay and unreasonable expense of time, energy, and perhaps money."). *Grynberg v. Total S.A.,* 2006 WL 1186836 (D. Colo. 2006). Plaintiff objects to the Request to the extent it seeks information that is protected by the attorney-client privilege or work product doctrine.

Without waiving and subject to these objections Plaintiff responds to the best of his recollection as follows:

Preparation, running the grill, working the line, cash on Alejandra's drawer because I wasn't clocked in, office work, store maintenance. Every task I would do on a daily basis was required to be performed on and off the clock.

### INTERROGATORY NO. 16:

Describe in detail each and every basis for Your estimation that You are entitled to approximately $5,000 - $6,000 of unpaid and owed overtime compensation, as represented in Your First Supplemental Disclosures dated August 7, 2013.

**ANSWER**: Plaintiff incorporates herein by reference the General Objections listed above.

I worked at least 10-15 hours of overtime every week for which I was not paid and for which I should have received time and a half. Additionally, I worked holiday's for which I was not paid. However, it should be corrected. I am claiming damages in the amount of $17,280.00 unpaid overtime wages (See Plaintiff's 2nd Supplemental Disclosures). This number reflects three years of damages, whereby I was working an average of 15 hours of overtime weekly at a pay rate of $12.00/hour during a 16 month period.

### INTERROGATORY NO. 17:

Identify by name and position any Chipotle employee whom You directed, permitted, required, authorized or otherwise instructed at any time to "clock out" and continue working without recording his or her time worked.

**ANSWER**:  Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Plaintiff responds as follows:

None, however, Alejandra did go back and edit their time and told me, Britany and Megan to edit multiple employees' times and when we did not do it, she would tell us we had to go back and fix it. I would even try to go back after she changed employees' times and fix it, and she would go right back and fix it and yell at me.

11

**INTERROGATORY NO. 18:**

Identify by name and position any Chipotle employee whose hours worked You redistributed, reallocated, reposted, reapportioned or otherwise adjusted with the effect of depriving him or her of payment for all hours worked or all overtime hours worked.

**ANSWER:** Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Plaintiff responds as follows:

None, in fact I tried to give people back the hours Alejandra had taken from them.

**INTERROGATORY NO. 19:**

Identify by name and position any current or former Chipotle employee who has communicated to You by any means and at any time any complaint, concern, objection, or issue of any kind Relating To not being paid by Chipotle for all hours worked or all overtime hours worked.

**ANSWER:** Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Plaintiff responds as follows:

Britany Links, KM/SM; Meagan LNU , Service Manager; Josh LNU, employee; Jose LNU, employee; Agustin LNU, apprentice; Jenny V.; and most employees working during that period whose names I don't specifically recall.

**INTERROGATORY NO. 20:**

Identify each and every action You have taken in response to any complaint, concern, objection, or issue of any kind communicated to You by any of the individuals identified in Your Response to Interrogatory No. 18 and Relating To not being paid by Chipotle for all hours worked or all overtime hours worked.

**ANSWER:** Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Plaintiff responds as follows:

I always tried to give back hours worked and Alejandra always took them back.

## INTERROGATORY NO. 21:

If You claim that You were acting pursuant to any custom, practice or policy of Chipotle in directing, permitting, requiring or otherwise instructing any Chipotle employee to "clock out" and continue working without recording his or her time worked, describe each and every such custom, practice or policy.

**ANSWER:** Plaintiff incorporates herein by reference the General Objections listed above. Additionally, Plaintiff objects as this Interrogatory is overly broad and unduly burdensome. *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649 (10th Cir. 2008) (request for all information related to "the litigation or the allegations, facts and circumstances concerning the litigation" was overly broad and not stated with "reasonable particularity" as required by Rule 34(b)(1)(A)); *see also IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) ("To require specifically 'each and every' fact, however, would too often require a laborious, time consuming analysis, search, and description of incidental, secondary, and perhaps irrelevant and trivial details. The burden to answer then outweighs the benefit to be gained. Other discovery procedures, such as depositions and production of documents, better address whatever need there be for that kind of secondary detail."). Further, courts condemn "blockbuster" interrogatories: "at some point a reasonable limit against indiscriminately hurling interrogatories at every conceivable detail and fact which may relate to a case . . . . Indiscriminate use of blockbuster interrogatories, such as these, do not comport with the just, speedy, and inexpensive determination of the action. To require answers to them would more likely cause delay and unreasonable expense of time, energy, and perhaps money."). *Grynberg v. Total S.A.*, 2006 WL 1186836 (D. Colo. 2006). Plaintiff objects to the Request to the extent it seeks information that is protected by the attorney-client privilege or work product doctrine. Moreover, the Plaintiff objects to this interrogatory as vague and ambiguous to the extent that the term "policy" is undefined; therefore the Plaintiff is left to guess at the Defendant's meaning of the term and if it is meant to describe written policies and procedures, policies and procedures that were verbal, and/or policies and procedures over multiple locations. Due to the lack of a clear definition the Plaintiff cannot properly respond to this interrogatory because it is impossible for her to guess the meaning of this term and/or phrase.

Without waiving and subject to these objections Plaintiff responds to the best of his recollection as follows:

I did not instruct anyone to work off the clock. I encouraged them to fight for their hours worked or to call the labor board.

**INTERROGATORY NO. 22:**

If You claim that You were acting pursuant to any custom, practice or policy of Chipotle in, redistributing, reallocating, reposting, reapportioning or otherwise adjusting the hours of any Chipotle employee with the effect of depriving him or her of payment for all hours worked or all overtime hours worked, describe each and every such custom, practice or policy.

**ANSWER:**  Plaintiff incorporates herein by reference the General Objections listed above. Additionally, Plaintiff objects as this Interrogatory is overly broad and unduly burdensome. *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649 (10th Cir. 2008) (request for all information related to "the litigation or the allegations, facts and circumstances concerning the litigation" was overly broad and not stated with "reasonable particularity" as required by Rule 34(b)(1)(A)); *see also IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) ("To require specifically 'each and every' fact, however, would too often require a laborious, time consuming analysis, search, and description of incidental, secondary, and perhaps irrelevant and trivial details. The burden to answer then outweighs the benefit to be gained. Other discovery procedures, such as depositions and production of documents, better address whatever need there be for that kind of secondary detail."). Further, courts condemn "blockbuster" interrogatories: "at some point a reasonable limit against indiscriminately hurling interrogatories at every conceivable detail and fact which may relate to a case . . . . Indiscriminate use of blockbuster interrogatories, such as these, do not comport with the just, speedy, and inexpensive determination of the action. To require answers to them would more likely cause delay and unreasonable expense of time, energy, and perhaps money."). *Grynberg v. Total S.A.*, 2006 WL 1186836 (D. Colo. 2006). Plaintiff objects to the Request to the extent it seeks information that is protected by the attorney-client privilege or work product doctrine. Moreover, the Plaintiff objects to this interrogatory as vague and ambiguous to the extent that the term "policy" is undefined; therefore the Plaintiff is left to guess at the Defendant's meaning of the term and if it is meant to describe written policies and procedures, policies and procedures that were verbal, and/or policies and procedures over multiple locations. Due to the lack of a clear definition the Plaintiff cannot properly respond to this interrogatory because it is impossible for her to guess the meaning of this term and/or phrase.

Without waiving and subject to these objections Plaintiff responds to the best of his recollection as follows:

I did not do so unless made to do so by Alejandra with her there and would actually correct when she left.  She always came back and changed everyone's' time daily.

## INTERROGATORY NO. 23:

Describe in detail each and every document – whether in Your possession, the possession of Chipotle, or the possession of a third party – Relating To any custom, practice or policy described in any of Your responses to Interrogatory Nos. 4, 8, 10, 21 & 22

**ANSWER**:   Plaintiff incorporates herein by reference the General Objections listed above. Additionally, Plaintiff objects as this Interrogatory is overly broad and unduly burdensome. *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649 (10th Cir. 2008) (request for all information related to "the litigation or the allegations, facts and circumstances concerning the litigation" was overly broad and not stated with "reasonable particularity" as required by Rule 34(b)(1)(A)); *see also IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) ("To require specifically 'each and every' fact, however, would too often require a laborious, time consuming analysis, search, and description of incidental, secondary, and perhaps irrelevant and trivial details. The burden to answer then outweighs the benefit to be gained. Other discovery procedures, such as depositions and production of documents, better address whatever need there be for that kind of secondary detail."). Further, courts condemn "blockbuster" interrogatories: "at some point a reasonable limit against indiscriminately hurling interrogatories at every conceivable detail and fact which may relate to a case . . . . Indiscriminate use of blockbuster interrogatories, such as these, do not comport with the just, speedy, and inexpensive determination of the action. To require answers to them would more likely cause delay and unreasonable expense of time, energy, and perhaps money."). *Grynberg v. Total S.A.,* 2006 WL 1186836 (D. Colo. 2006). Plaintiff objects to the Request to the extent it seeks information that is protected by the attorney-client privilege or work product doctrine. Moreover, the Plaintiff objects to this interrogatory as vague and ambiguous to the extent that the term "policy" is undefined; therefore the Plaintiff is left to guess at the Defendant's meaning of the term and if it is meant to describe written policies and procedures, policies and procedures that were verbal, and/or policies and procedures over multiple locations. Due to the lack of a clear definition the Plaintiff cannot properly respond to this interrogatory because it is impossible for her to guess the meaning of this term and/or phrase.

Without waiving and subject to these objections Plaintiff responds to the best of his recollection as follows:

Chipotle has access to all of their policies and procedures. Additionally, I believe the Envision Security System will show the improper wage and hours practices being implemented by Alejandra.

**INTERROGATORY NO. 24:**

Identify by name, court or agency of record, and case number, each and every complaint, lawsuit, dispute, demand, charge or controversy of any kind Relating To non payment of hours worked or overtime hours worked by any of Your current or former employers.

**ANSWER:** Plaintiff incorporates herein by reference the General Objections listed above. Without waiving and subject to these objections Plaintiff responds as follows:

None that I recall.

Dated: September 26, 2013

/s/ Karen B. O'Connor
Karen B. O'Connor
BACHUS & SCHANKER, LLC
1899 Wynkoop Street
Suite 700
Denver, Colorado 80202
Phone:   (303) 893-9800
Facsimile: (303) 893-9900
Karen.Oconnor@coloradolaw.net

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of September, 2013, a true and correct copy of the foregoing **PLAINTIFF'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES** will be sent to all parties via email.

/s/ Marla Rapp, CP_____
Certified Paralegal at Bachus & Schanker

17