IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02612-JLK

LEAH TURNER, et al., individually and on behalf of others
similarly situated

      Plaintiffs,
v.

CHIPOTLE MEXICAN GRILL, INC.,

      Defendant.

## MEMORANDUM OPINION AND ORDER

Kane, J.

This wage and fair labor standards case is one of several around the country brought by employees of Chipotle Mexican Grill on behalf of themselves and those similarly situated. The gist of the workers' complaints is that company time keeping practices result in closing shift employees having to continue working after they are automatically timed out. The matter is before me on Plaintiffs' Motion for Conditional Collective Action Certification and for Judicial Notice to Class (Doc. 28). Specifically, Plaintiffs move for entry of an Order of "conditional collective action certification" and for company-wide judicial notice to all current and former non-exempt hourly workers employed by Chipotle for the three years preceding the filing of this action (excluding

employees who worked at the Crystal, Minnesota Chipotle restaurant who are plaintiffs in a related action).[1] I have considered the Motion carefully.

For the reasons set forth below, I GRANT the Motion, but do so under a liberal joinder standard rather than any application of Rule 23's class action "certification" process. I am persuaded that a proper reading of the FLSA at this stage of collective action proceedings requires little more than the permissive joinder of putative class members, and I reject the premise that collective action certification under 29 U.S.C. § 216(b) must hew to the formalities of a two-step "certification" process under Rule 23, Fed. R. Civ. P.[2] Any qualified Chipotle worker who comes forward as a "similarly situated" employee may join in the action, subject to severance or other motion for misjoinder as the facts of the case develop. In so ruling, I reject the grudging, store-by-store approach adopted by the district court in *Harris*, and opt instead to give Plaintiffs all the rope they request so that their claims may be fully, if potentially not favorably, resolved.

I.  **BACKGROUND**

In their First Amended Collective Action Complaint, Plaintiffs Leah Turner, Araceli Gutierrez, Markeitta Ford, Jolessa Wade, Danya Granado, Brett Charles, and

---

[1] The related action is *Harris v. Chipotle Mexican Grill, Inc.*, Case No. 13-cv-719, a collective action filed in the U.S. District Court for the District of Minnesota in which the district judge rejected plaintiffs' motion for conditional certification of a nationwide collective action and limited the collective to a single store in Crystal, MN. The court's ruling resulted in Colorado plaintiff Leah Turner being excluded from that action, with leave to return to Colorado and pursue her claims there.

[2] I applied a two-step "certification" process as recently as 2013, in the still pending case of *Gordineer v. Rocky Mountain Offender Mgmt. Sys.*, No. 12-cv-1212-JLK, 2013 WL 179327 (D. Colo. Jan. 17, 2013). Having considered the question directly in this case, I simply observe that my thinking has evolved.

Ruby Tsao bring claims, on behalf of themselves and all others similarly situated, against Defendant Chipotle Mexican Grill, Inc. ("Chipotle") pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, and under the state laws of Arizona, California, Colorado, and New Jersey. First Am. Collective Action Compl. (Doc. 25).  Plaintiffs assert Chipotle has a company-wide policy of requiring non-exempt hourly paid employees to work "off the clock" without pay, and they seek to recover allegedly unpaid overtime compensation and other wages. *See id.* ¶¶ 2-3.

### A.   Defendant's Business

Chipotle operates a chain of non-franchised, Mexican-style restaurants throughout the United States. *Id*. ¶ 84. During the proposed certification period, Chipotle operated more than 1,800 restaurants nationwide and employed more than 217,000 hourly employees, known as "Crew Members," in its U.S. locations. Br. in Opp'n to Mot. to Certify Class (Doc. No. 80)("Br. in Opp'n"), 6-7.

Chipotle's official timekeeping policy explicitly provides "that all hourly employees must record and be paid for all time worked" and "prohibits any off-the-clock work." Decl. of David Gottlieb (Doc. 80-5), ¶ 37. Employees receive information regarding the timekeeping policy from the Crew Handbook and Restaurant Management Handbook, as well as during orientation and training. *Id*. at ¶ 39.

In order to effectively record employees' hours worked, Chipotle uses a common food service industry computer program called "Aloha." Gottlieb Decl. at ¶ 40.  Aloha tracks employee hours and records and processes each store's customer transactions.  It also creates labor and sales projections, including "overtime alerts," which "empowers

3

management to make day-to-day mission critical decisions." Decl. of Karen O'Connor (Doc. 28-2) at 2. In order to compile daily sales and employment information, Aloha automatically resets every night at 12:30 a.m. in most restaurants.[3] Gottlieb Decl. at ¶49. Important for this case is the fact that any employee working when the system resets is automatically clocked out. *Id*.

### B. The Named Plaintiffs and Their Allegations

The named Plaintiffs are each current or former hourly-paid employees at Defendant's restaurants in various states throughout the country:

- Plaintiff Leah Turner was employed as a non-exempt hourly employee at Defendant's Parker, CO restaurant from March 29, 2010 until May 23, 2011. She worked first as a Crew Member and later as a kitchen, then service, manager. Turner eventually became general manager of the Castle Rock, CO restaurant, serving as an exempt salaried employee until March 25, 2015.

- Araceli Gutierrez was a non-exempt hourly employee at Defendant's Santa Ana, CA restaurant from April 20, 2012 until July 24, 2014.

- Markeitta Ford and Jolessa Wade were non-exempt hourly employees at Defendant's East Hanover, NJ restaurant from December 2013 until February 2014.

---

[3] In some restaurants, the reset occurs at a later time, such as 1:00 a.m., 1:30 a.m., or 3:00 a.m. (See Gottlieb Decl. ¶ 49.)

- Danya Granado was a non-exempt hourly employee at Defendant's Aurora, CO restaurant from June 8, 2013 until January 2, 2014.

- Brett Charles was a non-exempt hourly employee at Defendant's Gilbert, AZ restaurant from May 31, 2011 until September 30, 2013.

- Ruby Tsao was employed as a non-exempt hourly employee at Defendant's Parker, CO restaurant from May 12, 2013 until September 21, 2014.

*See* Turner Decl. [Doc. No. 28-1] ¶¶ 2-4; Gutierrez Decl. [Doc. No. 28-1] ¶ 2; Ford Decl. [Doc. No. 28-1] ¶ 2-3; Tsao Decl. [Doc. No. 28-1] ¶ 2; Gottlieb Decl. [Doc. No. 80-5] ¶¶ 25, 28, 29.

Together Plaintiffs allege Chipotle "has devised and implemented general policies and practices to deprive its hourly paid employees of the compensation to which they are entitled," and that these policies result in employees being required to "work 'off-the-clock,' without pay." Am. Compl. at ¶ 2. Plaintiffs contend Chipotle implements this policy through "centralized, company-wide labor or payroll budgets that . . . incentivize [sic] managers to understaff restaurants," as well as through "timekeeping devices that automatically punch employees off the clock, even if they are still working." *Id*. Plaintiffs claim that these policies originate at Chipotle's corporate headquarters in Colorado to be carried out by general managers nationwide. Pls.' Mot., at 3. Based on these allegations, Plaintiffs contend all Chipotle employees who have been required to work off the clock are "similarly situated" for the purposes of an FLSA collective action. *See id*. at 27.

**C. Procedural History**

The procedural history of this case is tortuous, and uniquely so. It is the second action initiated by Plaintiff Leah Turner in this Court, succeeding her original action, *Turner v. Chipotle Mexican Grill of Colorado, LLC*, filed on March 27, 2013 and assigned to a different district judge. *See* Civil Action No. 13-cv-00794 ("*Turner I*"). Turner voluntarily dismissed the *Turner I* lawsuit in October 2013, after consenting to join the *Harris* action then pending in the District of Minnesota. Ms. Turner filed her Stipulation of Dismissal in *Turner I* after advising defense counsel that she would refile the Colorado case if the Minnesota court failed to recognize a company-wide collective.

As appears *de rigeur* in federal trial courts everywhere, the presiding judge in *Harris* referred plaintiffs' motion for collective action certification to a magistrate judge, who made findings and recommended certification of a company-wide collective. The district judge rejected the magistrate's recommendation, and on September 9, 2014, issued a Memorandum Opinion and Order limiting the collective action certification in *Harris* to a single Minnesota store. As a result of this Order, Turner was excluded from the *Harris* lawsuit and nearly one year from the date she voluntarily dismissed *Turner I* and re-filed her collective action Complaint here ("*Turner II*).

Ms. Turner's renewed lawsuit has been stymied by procedural hurdles, including an initial assignment to a magistrate judge under this Court's pilot program regarding consent jurisdiction and reassignment to an article III judge almost four months later when consent was not achieved. (Doc. 19.) In addition, Chipotle moved immediately to dismiss *Turner II* on claim preclusion/res judicata grounds, arguing Turner had had her

6

chance to seek national collective certification in *Harris* and should be limited in this case to an individual action only.

On January 21, 2015, Turner sought, and obtained leave, to file an Amended Complaint. (Doc. 25.) On February 2, she filed the instant Motion for Conditional Collective Action Certification and for Judicial Notice, together with a Motion to Toll Statute of Limitations during the notice period. (Docs. 28 & 29.) As part of these filings Turner included a proposed form of Notice, a proposed "Consent to Join" form, three complaints filed with the Minnesota Department of Labor and Industry by Chipotle employees alleging new overtime violations, a copy of Defendant's "Crew Handbook," declarations from four former Chipotle employees supporting the allegations in the Amended Complaint, other collective action complaints brought against Defendant alleging overtime violations, and multiple postings on internet forums by former Chipotle employees alleging overtime violations. *See id.* (and attachments thereto).

Chipotle again moved to dismiss, arguing the question of a company-wide collective had been resolved in *Harris* and that Turner should be limited to an individual or Colorado-only claim. In the alternative, Chipotle asked that I transfer *Turner II* to Minnesota where it could be resolved together with *Harris*. (Doc. 32.) Chipotle also moved to stay all proceedings in the renewed Colorado action until the Motion to Dismiss had been resolved. (Doc. 34.)

As soon as briefing was complete, I denied Chipotle's Motions. *See* Order dated March 19, 2015 (Doc. 55, text entry only). In substantive but summary fashion, I rejected Chipotle's invocations of the first-to-file rule and "doctrine of claim splitting,"

7

observing that a motion for conditional collective certification was not a "claim" and that Ms. Turner was not bound by the Minnesota court's denial of that motion here. *See id.* I also ordered this case set for a status conference to set a briefing schedule for Plaintiffs' Conditional Collective and Equitable Tolling motions. *Id.* My intent was to put a stop to the procedural folderol and get this case on track. Plaintiffs' wage claims by then had been for more than two years without ever getting out of the gate.

The status conference was held on April 7, 2015. Throughout the time leading up to the conference, Ms. Turner had continued to file declarations and "consent to join" forms from Chipotle employees claiming to be similarly situated and seeking relief. *See* Pls.' Req. for Judicial Notice (Doc. 69), Notice of Filing of Consent to Join Forms (Doc. Nos. 35-40, 44-46, 53, 67, 70). Chipotle urged me to strike these forms and to prohibit any additional filings, which I declined. Plaintiffs' Motions were fully briefed on June 17, 2015, and are ripe for determination.

## II.   DISCUSSION

The FLSA provides employees with a private right of action against their employers for unpaid wages and overtime compensation, as well as for liquidated damages. The operative enforcement provision of the Act is found in § 16:

> An action to recover the liability prescribed [under the FLSA] may be maintained against any employer…by any one or more employees for and in [sic] behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C.A. § 216(b).  A threshold issue in this case is the proper procedural mechanism for pursuing a representative action "on behalf of" employees similarly situated.  Both sides articulate this procedure in Rule 23 class "certification" rubric.  Plaintiffs argue for "conditional certification" under a "lenient, notice stage" standard that favors certification as long as there are "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."  Pls.' Mot. (Doc. 28) at 17-18.  Chipotle argues for a stricter standard, stating that Plaintiffs have already had the benefit of discovery in the *Harris* case so that "certification" is warranted only as to store locations where a plaintiff has "substantial evidence" of a common decision, policy, or plan.  Opposition (Doc. 80) at pp. 20-21.

Concerned that the "class certification" nomenclature has skewed proper analysis of collective actions under the FLSA, I pause first to articulate a standard that sets it straight.  I will then apply that standard to determine the scope of the collective that will be permitted to proceed in this case, and address the notice and equitable tolling issues.

**A.  Legal Standard for Collective Action under the FLSA.**

On the question of how a collective action under Section 16 of the FLSA should be commenced, I am persuaded that the "certification" rubric borrowed from Rule 23 has no place in wage claim litigation under the FLSA.  It mires cases in procedural prerequisites that thwart wage-earners' rights to discovery and redress.  Instead, I agree with legal scholars and practitioners who have recently critiqued courts' reliance on class "certification" concepts in FLSA cases, finding them the result of a confluence of factors, including haphazard terminology, a misunderstanding of precedent and legislative intent,

and excessive path dependence in the application of *stare decisis.* *See* Scott A. Moss, Nantiya Ruan, *The Second-Class Class Action: How Courts Thwart Wage Rights by Misapplying Class Action Rules*, 61 Am. U. L. Rev. 523 (2012); Allan G. King, Camille C. Ozumba, *Strange Fiction: The "Class Certification" Decision in FLSA Collective Actions*, 24 Lab. Law. 267 (2009).

In their well-crafted critique, Professors Moss and Ruan explain that the use of a two-stage "class certification" approach to FLSA collective actions under the FLSA is a relatively recent jurisprudential development triggered by imprecise pleading and "stare decisis yield[ing] path-dependence and lock-in." Moss, *supra* fn. 303 and accompanying text. The professors analyze the evolution of FLSA jurisprudence from the passage of the Fair Labor Standards Act in 1938 to the present, observing that for the first 50 years, § 16 was uniformly interpreted as allowing liberalized permissive joinder of any party plaintiff "similarly situated." The only requirement, per the statute, was that each plaintiff "gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." § 216(b). Moss, *supra* at 542-43 (noting joinder was the primary interpretation of § 216(b) for decades, and citing representative cases from the 1940s through the 1970s); *Fink v. Oliver Iron Min. Co.*, 65 F.Supp. 316, 318 (D. Minn. 1941) ("It seems clear, therefore, that all Congress intended under Section 16 of the Fair Labor Standards Act [codified as 29 U.S.C. § 216(b)] was a permissive joinder in any suit brought by an employee for the benefit of others similarly situated.")

Joinder under § 216(b) is thus even more lenient than joinder or intervention under Federal Rules of Civil Procedure 19, 20, and 24, which require that either "the current

plaintiffs move to amend the complaint to add…additional plaintiffs, the additional plaintiffs move to intervene in the litigation, or the defendant moves to add these individuals as 'necessary parties,' and the court rules favorably on these motions." King, *supra* at 274 (original citations and ordinals omitted).

> In contrast, no court action is required to add any number of "opt-ins" to an FLSA collective action, and whether anyone joins the litigation is solely at his or her election. In fact, anyone whosoever may "consent" to join the action merely by filing an appropriate form, and it then becomes the responsibility of other parties to move the court to dismiss or sever the claims of those who allegedly are improperly joined…[A]ll those who opt in are party-plaintiffs and remain in the lawsuit unless they are dismissed from the action."

*Id.*

During the half-century between 1938 and 1987 collective actions under § 216(b) were often analogized to one particular type of class action under the then Rule 23(a)(3), which were known as "spurious class actions," but not to either of the other types of class actions. Moss, *supra* at 547. This analogy was precise given that collective actions under § 216(b) and spurious class actions under then Rule 23(a)(3) were "both aggregated damages claims for only those who opted in and both were joinder liberalizations." *Id.* Whether analogized to spurious class actions or not, for fifty years district court interpretations of § 216(b) were in accord with sound interpretation of the statutory text and the legislative intent.

Wrongly requiring "certification" in § 216(b) collective actions had its genesis in the 1966 enactment of the modern Rule 23, which did away with the spurious class action and imposed rigorous certification requirements and procedural hurdles for individuals

11

seeking to join together as a class. The purpose of the Rule 23 class action device is to provide access to justice for negative value lawsuits, but at the cost of binding in the judgment parties absent from the litigation process. *See Lucas v. Pioneer, Inc.*, 256 N.W.2d 167, 172, 177 (Iowa 1977) (in the context of a state version of a liberalized joinder provision, stating that the "[r]ights of those not present are not bindingly adjudicated" as they would be under the modern Rule 23). Protecting the right to due process for absent parties is the rationale for Rule 23's procedural hurdles -- certification, notice, and the opportunity for potential class members to opt out and preserve the right to litigate on their own -- and a major rationale for the 1966 amendments to Rule 23. *See Hansberry v. Lee*, 311 U.S. 32 (1940) (discussing the constitutional requirements of due process created in the context of Rule 23's binding of absent parties).

While Section 216(b) collective actions, like Rule 23 class actions, are often aggregated negative value lawsuits where the ability to aggregate claims gives plaintiffs access to justice they would not otherwise have, they differ fundamentally from Rule 23 class actions in the manner in which putative plaintiffs elect to participate and are bound by the result.  In Rule 23 class actions, similarly situated individuals are represented by the representatives of the class and are bound by the result unless they opt out of class membership. In FLSA collective actions, by contrast, only those who opt in have a stake in the litigation, and those who fail to do so neither participate nor benefit from any favorable ruling.  This difference removes any rationale for subjecting individual party plaintiffs in collective actions to the rigorous procedural requirements of class actions. Nonetheless, attorneys and courts conflate collective actions with modern Rule 23 class

12

actions, especially when plaintiffs plead both a § 216(b) collective action and a Rule 23 class action, or when plaintiffs erroneously plead Rule 23 on a cause of action where the requisite enforcement mechanism is § 216(b). Moss, *supra* at 549.

The case of *Lusardi v. Xerox Corp.,* 118 F.R.D. 351 (D. N.J. 1987), is credited with originating the modern trend of conflating the certification requirements of Rule 23 class actions with the liberalized joinder device of collective actions. *Lusardi* involved a collective action brought under the Age Discrimination Employment in Act ("ADEA"), civil rights era anti-discrimination legislation that expressly borrows § 216(b) as its collective action enforcement mechanism. *See* 29 U.S.C. § 626(b)(incorporating by reference the FSLA's enforcement mechanism at 29 U.S.C. § 216(b)). In marshaling their age discrimination claims, the *Lusardi* plaintiffs, like Plaintiffs here, moved as "similarly situated" individuals for certification as a Rule 23 class action. The district court found that § 216(b) provided exclusively for collective actions, and not Rule 23 class actions, and granted plaintiffs leave to proceed as a collective action under § 216(b). Inconsistent with this ruling, however, the *Lusardi* court used language indicating it was granting the plaintiffs' request for "certification" as a "class action." 118 F.R.D. at 93. Doing so formalized the error in plaintiffs' pleadings, and conflated the Rule 23 nomenclature with what is more precisely a § 216(b) collective action, for which certification is not required. After discovery was complete the defendant moved to "decertify the conditional class," following the court's lead and further perpetuating the conflated nomenclature. *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987).

Citing *Lusardi,* several district courts employed a two-stage "certification" process to manage an FLSA collective action. *See* Moss & Ruan, *supra* at 551 (collecting cases). When the first circuit court recognized the process in 1995, a star was born. *See Mooney v. Aramco Services Co.*, 54 F.3d 1207 (5th Cir. 1995)(holding district court did not abuse its discretion in FLSA collective action litigation in applying class certification approach). The Tenth and Eleventh Circuits have since followed suit -- *see Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) *and Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001) -- and now district courts in nearly every circuit "cite *Mooney*, and sometimes *Hipp* and *Thiessen* too" as binding authority for subjecting plaintiffs in FLSA collective actions to a Rule 23-like class certification process. Moss & Ruan, *supra* at 551.

Further complicating matters is the conflation of straightforward "my employer owes me money" wage claims under the FLSA with more complex and nuanced employment discrimination rubric. In their "Strange Fiction" article (cited *supra* at p. 10) King and Ozumba discuss in illuminating fashion the genesis of this enmeshment, and its fallout for wage act claimants.

Congress passed the ADEA in 1967, authorizing similarly situated plaintiffs to aggregate their claims and incorporating § 16 of the FLSA as its enforcement mechanism. For the next thirty-five years, age-discrimination cases accounted for the vast majority of collective actions under section 216(b) of the FLSA. King & Ozumba, *supra* at 286-87. As a result, the leading cases that address collective action proceedings under section 216(b) were ADEA actions, rather than actions brought under the FLSA. *Id.* The result

was far-reaching, because now FLSA wage-claim actions are not only subjected to unwarranted class certification requirements, they are also often wrongly subjected to the more rigorous invidious animus standards of discrimination claims.

Under the ADEA, an individual employee may obtain relief by demonstrating that his employer "has engaged in a 'pattern or practice' of discrimination" against similarly situated, i.e., older, employees. These "pattern or practice" allegations give rise to an inference of invidious intent, a necessary element for a claim of age (or any other actionable employment-based) discrimination. King & Ozumba, *supra* at 287-88. The FLSA, with limited exceptions, is a strict-liability statute. Plaintiffs are not required to demonstrate invidious intent or any other type of culpable mind. "If an individual who is entitled to hourly compensation works unpaid hours, the employer is liable irrespective of whether it intended to deprive the employee of his or her pay." *Id.* at 288.

> As a result, rules that are helpful in certifying ADEA class actions may mislead in deciding whether to certify an FLSA class action. For example, the suggestion that plaintiffs need only make "substantial allegations that the putative class members were together the victims of a single decision, policy or plan infected by discrimination" to merit conditional certification in an age discrimination case is unhelpful in an FLSA case, given that this is a legal standard particular to proving some form of requisite intent.

*Id.* at 289. This is so because the rights at issue in discrimination cases derive from membership in a protected group. The rights protected by the FLSA – including the subject right to be paid for hours one has actually worked – are actionable without reference to any membership in a protected class. Wage rights are *individual* rights, and

a collective action is the device that enables co-workers holding these individual rights to aggregate and enforce them, collectively.

For these reasons, there can be no requirement that wage claimants prove a "single decision, policy, or plan" to deprive them of pay in order to prevail on a claim for payment. Any such requirement diminishes the individual's rights under the FLSA, and blunts the statute's effect by disenabling individuals from enforcing their rights collectively. In short, discrimination and wage claims are two entirely distinct bodies of law, and there are important rationales for keeping them so.

The deleterious effects of imposing a "certification" requirement on individuals who would aggregate to pursue wage claims under the FLSA, and as part of that require them to allege a "pattern or practice" of misdeeds to justify their aggregation, are obvious. Claimants are forced to answer evidence-based challenges to their lawsuit before it is off the ground, when all of the evidence to support their claims is in the hands of their employer. As Professors Moss and Ruan observe, "[v]irtually all collective actions that courts reject because of differing job duties or supervisors would amply meet the proper joinder standard, so long as plaintiffs share a single common issue of law or fact." Moss, *supra* at 575. Prohibiting potential FLSA wage-claim party plaintiffs from joining as a collective because they do not meet the legal standards for discrimination claims, in my view, would be a profound miscarriage of justice.

The proper approach, and the one I apply, is to presumptively allow workers bringing the same statutory claim against the same employer to join as a collective, with the understanding that individuals may be challenged and severed from the collective if

the basis for their joinder proves erroneous.  *See* Moss and Ruan, *supra* at 570.  Some § 216(b) claimants may prove too different for collective treatment.  Rather than subject them to heightened pleading standards or evidentiary burdens of proving commonality, however, the letter and spirit of § 216(b) suggests handling them as any other challenge to a Rule 20 joinder in an existing plaintiff's claims.  Rule 21 (misjoinder) and Rule 42 (severance) are the proper vehicles for challenging individual plaintiffs in an FLSA collective action, and that is the process to be followed here.

### B.  Notice and Equitable Tolling.

Because I am recognizing a permissive joinder standard for Chipotle crew members to collectivize in this case, I must address the related questions of notice (i.e., whether an additional public notice period is necessary given the procedural history of this action and if so, what form and duration that notice period should take) and whether it is appropriate to toll the statute of limitations so that additional joinders received during any future notice period won't have to worry about being time-barred.  Having become intensely familiar with this litigation and the "off-clock" wage claims pending against Chipotle in Minnesota, Colorado and elsewhere, I would like to see Plaintiffs' allegations rise or fall on their merits, rather than as a result of procedural maneuvering, piecemeal litigation, or attrition.  As a result, I answer both questions in the affirmative.

With regard to Notice, Plaintiffs ask that I enter an Order requiring Chipotle to provide Plaintiffs with a "searchable and importable electronic list" of names, addresses, and last known email addresses of "all putative Class [sic] members," so that they may be informed of their right to join in this litigation.  Plaintiffs also ask to "toll" applicable

statutes of limitations for a period of 90 days after potential collective members "receive notice of the instant lawsuit," so that no potential plaintiff's claim will become time-barred in the interim.  Based on all of the foregoing, it is ORDERED that the currently joined Plaintiffs to this FLSA action are permitted to proceed against Chipotle as a collective, and that Plaintiffs' request for judicial notice so that similarly situated individuals may JOIN in the lawsuit is GRANTED.  Plaintiffs' Motion for Conditional Collective Action "Certification" (Doc. 28) is therefore GRANTED, even though the characterization of it as a "certification" is expressly and explicitly rejected.  The question of the proper FORM and MECHANISMS for effecting the requested notice is REFERRED back to the parties for resolution.  Plaintiffs' Motion to Toll the Statute of Limitations for 90 days once Notice is effected (Doc. 29) is GRANTED.

FURTHER ORDERED that the parties shall CONFER regarding the content of this Order and the form of the ordered Notice, and shall file a Status Report along with a proposed form of Notice on or before September 24, 2015.  A hearing on the matter will be set if necessary.

Dated August 21, 2015.   *s/John L. Kane*
SENIOR U.S. DISTRICT JUDGE