**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:14-cv-02612-JLK

LEAH TURNER, ARACELI GUTIERREZ, MARKEITTA FORD,
JOLESSA WADE, DANYA GRANADO, BRETT CHARLES, and
RUBY TSAO

individually and on behalf of others
similarly situated,

Plaintiffs,

v.

CHIPOTLE MEXICAN GRILL, INC.,

Defendant.

---

**REPLY IN SUPPORT OF CHIPOTLE MEXICAN GRILL, INC.'S
MOTION TO DISMISS OPT-IN PLAINTIFFS BOUND BY CHIPOTLE'S
ARBITRATION AGREEMENT**

---

Defendant Chipotle Mexican Grill, Inc. ("Chipotle") states as follows in support of its

request to dismiss all Opt-In Plaintiffs who are bound by Chipotle's arbitration agreement from

this action ("Motion"):

**<u>INTRODUCTION</u>**

2,184 Improper Opt-Ins are subject to the mandatory Arbitration Agreement with Chipotle

concerning their wage claims at issue here. In direct contradiction of that agreement, Plaintiffs'

Counsel invited them to join this collective action and now claim that the Improper Opt-Ins'

voluntary consent to that Arbitration Agreement should simply be ignored. They appear to argue

that if the Arbitration Agreement is enforced, they will be prevented them from *ever* pursuing their wage claims against Chipotle. The Improper Opt-Ins are wrong.

Chipotle's Motion seeks only to enforce the procedural limitations—by way of the Arbitration Agreement—the Improper Opt-Ins agreed would apply to their claims. It is legally unsupportable and fundamentally unfair to now allow the Improper Opt-Ins to avoid those contractual obligations or, alternatively, invoke them after intentionally ignoring them. And the Improper Opt-Ins' conclusory, unsupported factual statements and inapposite legal principles do not change this result. Accordingly, for the reasons set forth below, the Improper Opt-Ins' arguments should be rejected and Chipotle's Motion granted.

## ARGUMENT

### I.   THE IMPROPER OPT-INS SHOULD BE DISMISSED

#### A.   The Arbitration Agreement is Enforceable Against the Improper Opt-Ins

##### 1.   This Court Must Determine Arbitrability

The Improper Opt-Ins raise a threshold challenge to whether this Court may even address the substance of Chipotle's Motion. (Resp. at 5-6.) Specifically, they claim that the Arbitration Agreement's enforceability and scope are issues reserved to an arbitrator, rather than this Court. The Improper Opt-Ins are wrong, and their threshold argument should be rejected.

Whether there is an agreement to arbitrate between the parties and whether the agreement covers the dispute are "gateway" issues this Court has a duty to determine. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) ("Thus, a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide.") (quotations in original); *ARW Expl. Corp. v. Aguirre*, 45 F.3d 1455, 1460 (10th Cir. 1995) ("A

court must initially evaluate whether an individual is bound by a contractual duty to arbitrate before compelling arbitration."). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (brackets and quotes in original); *AT & T Techs. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."). Absent such "clear and unmistakable" evidence, the law assumes that this Court must decide those issues. *First Options*, 514 U.S. at 944-45; *see also Taubman Cherry Creek Shopping Ctr., LLC v. Neiman-Marcus Grp.*, 251 P.3d 1091, 1093 (Colo. App. 2010) (referring to "clear and unmistakable" standard as requiring "plain and unambiguous" evidence).

The Tenth Circuit recently held that an arbitration agreement that incorporated by reference the JAMS Streamlined Arbitration Rules and Procedures was "clear and unmistakable" evidence that the parties agreed to arbitrate arbitrability. *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1281 (10th Cir. 2017). The specific provision at issue (Rule 8(c)) provided that:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

*Id*. The *Belnap* Court held that because this rule gave the arbitrator clear authority to resolve arbitrability, and the rules were expressly incorporated by reference into the agreement, there was "clear and unmistakable evidence" that the parties intended the arbitrator to determine arbitrability. *Id*. at 1292. Accordingly, the Tenth Circuit determined the district court was obligated to grant the

motion to compel arbitration. *Id*. at 1292-93; *see also Dish Network, L.L.C. v. Ray*, 226 F. Supp. 3d 1168, 1172-73 (D. Colo. 2016) (employing same rationale and reaching same conclusion as to incorporation of AAA's National Rules for the Resolution of Employment Disputes).

Here, the incorporated provision is different. The Arbitration Agreement incorporates JAMS' Employment Arbitration Rules and Procedures ("Employment Rules"), which includes 11b. While Rule 11b is similar to *Belnap*'s Rule 8(c), it is not identical. Specifically, Rule 11b reads as follows:

> Jurisdiction and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. *Unless the relevant law requires otherwise*, the Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

(Dkt. 177, Ex. 2 (differing language emphasized).)

This additional language is dispositive of this Court's authority to engage in the "gateway" arbitrability determinations here. Rule 11b is ambiguous because it lacks the certainty found in Rule 8(c) as to its application. While Rule 8(c) conclusively states that the "Arbitrator has the authority to determine jurisdiction and arbitrability," Rule 11b prefaces that same rule with a mandate qualifying its applicability based on the requirements of other "relevant law." Thus, Rule 11b may—or may not—require an arbitrator to resolve arbitrability, depending upon the circumstances. Such an ambiguous provision cannot be "clear and unmistakable" evidence that the parties intended to arbitrate arbitrability. Stated differently, a provision that provides authority for both a court and an arbitrator to resolve arbitrability does not "clearly and unmistakably" demonstrate anything other than the arbitrator "might" decide arbitrability.

Rule 11b's reference to "relevant law" further demonstrates there is no clear and unmistakable evidence here. That term is not defined in either the Employment Rules or the Agreement. Yet it cannot be reasonably disputed that the law of contract interpretation is relevant to the Arbitration Agreement's enforcement and interpretation. Under choice-of-law principles, Colorado law applies. (Mot. at 11-12; section I.A.2, *infra*.) And, under Colorado law, "[c]ourts must examine the contract as a whole and attempt to determine the intent by reference to all of the contract's terms and provisions without viewing clauses or phrases in isolation." *Solid FX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1085 (D. Colo. 2013) (citing Colorado law). In undertaking this task, "courts should be wary of rewriting provisions" and should not extend the contract's provisions beyond their intended meaning. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003) (in insurance context).

The Arbitration Agreement's express provisions do not "clearly and unmistakably" grant the arbitrator authority to resolve arbitrability. Specifically, paragraph 8 of the Arbitration Agreement expressly delineates the arbitrator's authority—and nowhere mentions authority to resolve arbitrability. (Dkt. 173-1, Ex. A.) Paragraph 4, which defines "Claims Subject to Arbitration," is also silent as to the arbitrator's authority to resolve arbitrability. Its reference to "any and all disputes, claims, and controversies arising out of or relating to this Agreement" is insufficient to demonstrate the parties' specific intent to submit arbitrability to the arbitrator. *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 780 (10th Cir. 1998) (concluding contract "referring to 'any and all disputes arising out of or relating to' the contract did not provide clear and unmistakable evidence of intent to submit arbitrability to an arbitrator).

5

Moreover, Colorado law is clear that where a party seeks to enforce terms or conditions incorporated by reference in a contract, "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." *Taubman*, 251 P.3d at 1094 (cited in *Dish Network*, 226 F. Supp. 3d at 1173); *Vernon v. Qwest Commc'ns Intl, Inc.*, 857 F. Supp. 2d 1135, 1150 (D. Colo. 2012) (same). No such clarity or evidence exists here. Rather, because Rule 11b is ambiguous as to whether the arbitrator may decide questions of arbitrability, Colorado law holds that "the parties did not abrogate the general rule that courts make such determinations." *Taubman*, 251 P.3d at 1095.

Indeed, the circumstances here are akin to *Riley*. There, the Tenth Circuit concluded that there was not clear and unmistakable evidence that the parties intended to have the arbitrator determine the agreement's enforceability or scope—even though the parties had incorporated AAA rules. *Riley*, 157 F.3d at 777 n.1, 780. The *Riley* Court determined that "there is no hint in the text of the clause or elsewhere in the contract that the parties expressed a specific intent to submit" enforceability and scope questions to the arbitrator. *Id*. at 780. The Tenth Circuit observed in *Belnap* that *Riley* was distinguishable because "the version of the AAA Rules that was incorporated into the agreement did *not* include a provision concerning the arbitration of arbitrability." 844 F.3d at 1284 (emphasis in original). But *Riley* still stands for the proposition that incorporation of arbitration rules that do not "clearly and unmistakably" delegate the arbitrability determinations to an arbitrator will not alter the well-settled presumption that this Court must decide those issues. 157 F.3d at 779-80. And here, like *Riley*, incorporation of rules that are ambiguous as to the arbitrator's authority do not constitute "clear and unmistakable" evidence.

6

Accordingly, this Court has the authority and duty to engage in the arbitrability analysis here, and the Improper Opt-Ins' argument should be rejected.

### 2. The Arbitration Agreement is Enforceable

This Court applies "ordinary state-law principles that govern contract interpretation" in determining whether an arbitration agreement is enforceable. *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006).

The Arbitration Agreement is enforceable under Colorado law. Its silence as to the applicable law requires this Court to apply choice-of-law principles of the forum state—Colorado. *Salt Lake Tribune Publ'g Co. v. Mgmt. Planning, Inc.*, 390 F.3d 684, 695 (10th Cir. 2004) ("Absent a choice-of-law provision, a federal court sitting in diversity must apply the forum state's choice-of-law principles[.]"); *Weinman v. McCloskey*, Civ. Action No. 14-CV-00296-CMA-CBS, 2015 WL 1528896, at *5 (D. Colo. Mar. 31, 2015) (citing *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.2d 778, 809 (5th Cir. 2009)) (where federal question jurisdiction is invoked, "federal courts generally apply federal common law principles to resolve choice of law disputes" and rely on the Restatement (Second) of Conflicts of Law to define federal common law); Restatement (Second) of Conflict of Laws § 188 (in the absence of a choice of law provision, the law of the state with the most significant relationship to the transaction and the parties will be applied). Under Colorado's "most significant relationship test," Colorado law applies. (*Id*. at 11-13.) Colorado law favors arbitration agreements and enforces contracts supported by adequate consideration, as the Arbitration Agreement is here. (*Id*. at 12-13.)

Specifically, the Improper Opt-Ins' employment was conditioned on their signing the agreement, and both parties agreed to arbitrate their claims. *Grady v. DIRECTV Customer Servs.,*

*Inc.*, No. 14-cv-03474-CMA-NYW, 2015 WL 3619337, at *4 (D. Colo. June 10, 2015) (finding

adequate consideration supporting existence of arbitration agreement under Colorado law based

on these facts); *see also Pennington v. Northrop Grumman Space & Mission Sys. Corp.*, 269 F.

App'x 812, 820 (10th Cir. 2008) ("[W]e conclude the reciprocal obligation to arbitrate provides

the requisite consideration."); *see also Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058,

1063 (Colo. 2011) (in employment context, an at-will employee who is offered a new condition of

employment accepts that offer through continuing the employment relationship, and receives

consideration in the continued employment relationship); *City of Colo. Springs v. Mountain View

Elec. Ass'n, Inc.,* 925 P.2d 1378, 1383 (Colo. App. 1995) ("A promise exchanged for a promise

imposes mutual obligation and is sufficient consideration to render a contract enforceable.").

      The Improper Opt-Ins offer no substantive rebuttal to Chipotle's argument that under

choice-of-law principles Colorado law applies; nor would any such argument be credible. The

Improper Opt-Ins elected to seek redress in a Colorado-based court against a Colorado-based

company. Colorado law applies, and the Arbitration Agreement is enforceable.

      What the Improper Opt-Ins do offer is a conclusory assertion that the Arbitration

Agreement cannot be enforced because it "may" be unconscionable. (Resp. at 6, 8.) Under

Colorado law, the Improper Opt-Ins bear the burden of proving unconscionability. *Vernon*, 857 F.

Supp. 2d at 1157 (citing *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1055 (Colo. 2011)).

      Colorado law considers several factors in determining whether a contractual provision is

unconscionable, as articulated in *Davis v. M.L.G. Group*. 712 P.2d 985, 991 (Colo. 1986)

(articulating multi-factor test addressing both procedural and substantive unconscionability); *see*

*also Bernal v. Burnett*, 793 F. Supp. 2d 1280, 1286 (D. Colo. 2011) (citing *Davis* for same

proposition). A finding of unconscionability requires:

> evidence of some overreaching on the part of one of the parties such as that which
> results from inequity of bargaining power or other circumstances in which there is
> an absence of meaningful choice on the part of one of the parties *together with*
> contract terms which are *unreasonably favorable* to that party.

*Davis*, 712 P.2d at 991 (emphasis added); *see also Vernon*, 857 F. Supp. 2d at 1157.

While the Improper Opt-Ins claim the Arbitration Agreement *may* be unconscionable, they

make no effort whatsoever to actually demonstrate it is—whether under Colorado or any other

law. (Resp. at 6-8.) The Improper Opt-Ins assert that factual disputes exist that "will likely result

in the dismissal of at least some arbitration agreements on contract formation, validity,

enforceability, or other grounds." (*Id*. at 8.) Yet they fail to provide even a single affidavit from an

Improper Opt-In supporting those conclusory statements. They make no argument that the

circumstances under which the Arbitration Agreement was agreed to were "inequitable." *See*

*Davis*, 712 P.2d at 991. Even if some Improper Opt-Ins did not read the Agreement prior to signing

it, a party "generally cannot avoid contractual obligations by claiming that he or she did not read

the agreement." *Vernon,* 857 F.Supp.2d at 1152. And simply because the Arbitration Agreement

was "offered on a take or leave it basis" does not alone render the agreement unconscionable.

*Bauer v. Aspen Highlands Skiing Corp*., 788 F. Supp. 472, 474-75 (D. Colo. 1992); *see also Ad*

*Two, Inc. v. City & Cty. of Denver,* 983 P.2d 128, 132 (Colo. App. 1999) ("Even though a contract

is a printed form contract and offered on a 'take-it-or-leave-it' basis, these features alone do not

define adhesion contracts . . . . Furthermore, an adhesion contract is not created where the only

conduct by a party was to use its superior bargaining position to protect its investment by requiring protective terms in the contract.").

Moreover, the Improper Opt-Ins do not (and cannot) identify any contract term that "unreasonably favors" Chipotle. Indeed, given the mutuality of the arbitration obligation, the benefits and drawbacks of arbitration apply equally to both sides. (*See* Dkt. 173-1.) The Improper Opt-Ins bear no greater financial costs to arbitrate their claims than they would bringing them in court. (*Id*. at ¶ 7 ("Employee shall not be required to pay any cost or expense of the arbitration that Employee would not be required to pay if the matter had been heard in court.").) And Chipotle is denied the efficiencies of a class or collective action just as the Improper Opt-Ins are prohibited from bringing one. (*Id*. at ¶ 5.1.); *see also Bernal*, 793 F. Supp. 2d at 1280 (enforcing arbitration agreement that prevented class prosecution where relevant factors weighed against a finding of unconscionability).

Thus, regardless of the law applied, there is no evidence to support that the Arbitration Agreement is unconscionable. Accordingly, the Improper Opt-Ins, by failing to make any serious attempt to develop their unconscionability argument, have waived it. *See Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 880 n.9 (10th Cir. 1997) (holding that party who noted an issue and made "several broad, conclusory statements" on appeal "failed to make a serious attempt" to develop the argument, resulting in waiver). This Court should therefore reject it.

Further, the Improper Opt-Ins' argument that the Arbitration Agreement's enforceability is based on each Improper Opt-In's individual circumstances reveals that none of the Improper Opt-Ins are similarly situated. *See* 29 U.S.C. § 216(b) (requiring collective to be similarly situated).

10

The claimed differences in applicable law and factual circumstances demonstrate that under this Court's lenient permissive joinder standard, the Improper Opt-Ins have proven themselves "too different for collective treatment" and erroneously joined. (Dkt. 87 at 16-17.) The very fact that they are subject to the Arbitration Agreement, along with their alleged varying factual and legal circumstances, necessitate their expulsion from the collective.[1]

Finally, the Improper Opt-Ins' citations in passing to *Lewis v. Epic Systems Corp.*, 823 F.3d 1147 (7th Cir. 2016), *cert. granted*, 137 S.Ct. 809 (2017), *Ernst & Young v. Morris*, No. 16-300, and *National Labor Relations Board v. Murphy Oil USA*, No. 16-307, are insufficient to invalidate the Arbitration Agreement as a matter of law for two reasons. (Resp. at 2 & n.1.) First, the Improper Opt-Ins again fail to make any serious attempt to develop their argument, thereby precluding this Court's consideration of it. *Sports Racing*, 131 F.3d at 889 n.9.

Second, *Lewis'* rationale cannot be reconciled with Supreme Court precedent. Specifically, as the Fifth Circuit recognized in *D.R. Horton, Inc. v. N.L.R.B.*, the FAA's application "may be precluded by another statute's contrary congressional command." 737 F.3d 344, 358 (5th Cir. 2013) (citing *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 97-98 (2012)). Section 216 contains no such command (nor does any other FLSA provision). *Lewis'* rationale is faulty because it conflates a limitation on the procedure by which an employee may vindicate his or her FLSA rights with a prohibition on the ability to assert that right altogether. 823 F.3d at 1151-56 (holding that right to proceed as a collective in court was a substantive right that arbitration agreement

---

[1] Chipotle intends in short order to file a motion challenging the Improper Opt-Ins' joinder in this collective on this ground.

improperly limited). *Lewis* is further contrary to *Gilmer v. Interstate/Johnson Lane Corp.*, which rejected similar arguments under the ADEA, which is identical to § 216(b). 500 U.S. 20, 32 (1991) (rejecting argument that ADEA's provision for broad equitable relief and class actions provided right to court actions). The Improper Opt-Ins' argument should therefore be rejected.[2]

### 3. The Improper Opt-Ins' Claims Are Within the Arbitration Agreement's Scope

The Arbitration Agreement expressly states that "any and all disputes, claims, and controversies arising out of or related to this Agreement [and] the parties' employment relationship" are subject to arbitration—including FLSA and "state and local government wage and hour" claims. (Dkt. 173-1, Ex. A.) Thus, the Improper Opt-Ins' claims for FLSA and unjust enrichment/quantum meruit (seeking corollary common law relief) fall directly within the Arbitration Agreement's scope, and Chipotle's Motion should be granted on this basis alone.

To evade this clear language, the Improper Opt-Ins look to paragraph 5.2, which limits their ability to arbitrate collective or class action claims. (*Id.*) They argue that because paragraph 5.2 states that "employees can participate in representative actions on an individual basis," they are permitted to bring their FLSA and related claims in court. They are wrong for several reasons.

A provision limiting collective and class arbitration is not instructive as to what claims must be arbitrated. *See Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990) (contract "language must be examined and construed in harmony with the plain and generally accepted meaning of the words used, and reference must be made to all the agreement's

---

[2] Chipotle reserves the right to make additional arguments on this point in the event *Lewis*, *Ernst & Young*, or *Murphy Oil* are announced during the pendency of this action.

provisions."). Paragraph 5.2 does not, as the Improper Opt-Ins claim, provide any support for the idea that they may "*participate* in a representative action on an individual basis," much less one in court. (Resp. at 9 (emphasis in original).) Indeed, were this Court to interpret paragraph 5.2 as the Improper Opt-Ins insist, it would be in direct conflict with paragraph 4, requiring arbitration of *all* employment and wage claims. (*Id*.) That interpretation would be contrary to the well-established rule that a contract cannot be interpreted in a manner that "directly conflicts with [a] provision's terms." *GE Commercial Distrib. Fin. Corp. v. DonWin, LLC*, Civil Action No. 11-cv-01154-CMA-BNB, 2012 WL 628912, at * 4 (D. Colo. Feb. 27, 2012) (citing Colorado law for proposition that courts must look to plain and ordinary meaning of agreement).

Indeed, paragraph 5.2 cannot be read in isolation. *Solid FX*, 935 F. Supp. 2d at 1085 (court must examine contract as a whole). The Improper Opt-Ins ignore paragraph 5.1. (Resp., 8-9.) That section states in plain and uncertain terms that:

> 5.1 **Class and Collective Action Claims**. BY SIGNING THIS AGREEMENT, THE PARTIES AGREE THAT EACH MAY BRING AND PURSUE CLAIMS AGAINST THE OTHER ONLY IN HIS, HER, OR ITS INDIVIDUAL CAPACITY, AND MAY NOT BRING, PURSUE, OR ACT AS A PLAINTIFF OR CLASS MEMBER, IN ANY PURPORTED CLASS OR COLLECTIVE PROCEEDING.

(Dkt. 173, Ex. A, ¶ 5.1.) This section unambiguously precludes the Improper Opt-Ins from bringing, pursuing, or acting as a plaintiff in any class or collective proceeding. Stated differently, the Improper Opt-Ins are contractually prohibited from pursuing the claims as they are here—in court, as putative class and/or collective members/plaintiffs.

The Improper Opt-Ins' exclusive reliance on section 5.2 therefore fails. Indeed, an FLSA collective action is not a representative proceeding, particularly given the certification rubric this

Court has elected to follow. (*See* Dkt. 87 at 9-16 (stating that "class certification nomenclature has skewed proper analysis of collective actions under the FLSA" and employing party joinder analysis).) Further, the Arbitration Agreement's specific preclusion of class and collective actions controls over any reference to "representative action" (even assuming those actions are "representative" in nature). *Holland v. Bd. of Cty. Comm'rs*, 883 P.2d 500, 505 (Colo. App. 1994) ("[I]t is a basic principle of contract law that specific clauses of a contract control the effect of general clauses."). And, even if section 5.2 did apply here (it does not), the Improper Opt-Ins' attempt to characterize themselves as something other than "plaintiffs" to avoid its clear effect belies common sense, particularly given this Court's permissive joinder standard. The Improper Opt-Ins' argument should be rejected.

### B.   Dismissal Without Compulsory Arbitration is the Appropriate Remedy

#### 1.   Dismissal, Rather Than a Stay, is Appropriate

The Improper Opt-Ins agree that the Tenth Circuit has intimated that "a district court may dismiss when all claims are arbitrable and the movant specifically requests dismissal rather than a stay." (Resp. at 11 (citing *Hickey v. Brinker Int'l Payroll Co.*, Civ. Case No. 1:13-cv-00951-REB-BNB, No. 2014 WL 622883, at *5 (D. Colo. Feb. 18, 2014).); *see also Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 797 (10th Cir. 1995) (finding dismissal in absence of request for stay not erroneous). Because here both conditions are satisfied—all of the Improper Opt-Ins' claims must be arbitrated and Chipotle specifically requests dismissal—dismissal is proper. *See THI of N.M. at Hobbs Ctr., LLC v. Spradlin*, 893 F. Supp. 2d 1172, 1129 (D.N.M. 2012), aff'd on appeal, 532 Fed. Appx. 813 ("*Spradlin I*") (holding that neither 9 U.S.C. § 3 or § 4 requires the Court to stay a case when all issues pending before it have been resolved). This relief is consistent with

Chipotle's request that the status quo—in which the Improper Opt-Ins do not receive a nationwide notice procedure inviting their participation in direct contradict of their Arbitration Agreement[3]—be restored. (Mot. at 18.)

The Improper Opt-Ins' reliance on Third Circuit precedent is unpersuasive.[4] *Lloyd v. HOVENSA, LLC* is contrary to *Armijo* and *Spradlin I* and can be disregarded on that ground alone. 369 F.3d 263 (3d Cir. 2004); *see United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits.").

But even if *Lloyd* applies (it does not), it should not be followed. Legislation's plain meaning may be disregarded in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of the drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (brackets in original) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)); *see also Lloyd*, 369 F.3d at 269-70 ("We are free to disregard an unambiguous directive of Congress only in the rare instances where failing to do so produces a nonsensical result that could not have been intended."). The FAA "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). Doing anything other than outright dismissing the Improper Opt-Ins is a "nonsensical result" that is "demonstrably at odds" with the FAA, principles

---

[3] Notably, the Improper Opt-Ins make no effort whatsoever to demonstrate that any of them would have initiated their claims but for the notice to join this collective. (*See generally* Resp.)

[4] Their reliance on *Pollard v. ETS PC, Inc.*, 186 F. Supp. 3d 1166, 1169 (D. Colo. 2016), is equally unpersuasive. That case simply cites § 3's plain language without further analysis, and is contrary to both *Spradlin I* and *Armijo*. (Mot. at 16.)

of judicial economy, and Chipotle's contract rights. *See* Mot. at 17-18; *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) (holding § 3 "was not intended to limit dismissal of a case in the proper circumstances."); *Sea-Land Serv., Inc. v. Sea-Land of P.R., Inc.*, 636 F. Supp. 750, 757 (D. Puerto Rico 1986) ("Given our ruling that all issues raised in this action are arbitrable and must be submitted to arbitration, retaining jurisdiction and staying the action will serve no purpose" because any post-arbitration remedies will not entail the same issues). Because the Improper Opt-Ins enjoy no right to litigate their claims, either as a collective or in this Court, there is no reason to stall further resolution of the collective while the arbitrations, if any, proceed. Chipotle's Motion should therefore be granted.

### 2.  No Arbitration Should Be Ordered

The Improper Opt-Ins do not dispute 9 U.S.C. § 4 permits only a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to seek an order compelling arbitration. (*See generally* Resp.) Chipotle does not seek such an order here, and, based on § 4's plain language, the Improper Opt-Ins are without standing to request it (a point they make no effort to refute). On this ground alone, Chipotle's Motion should be granted. (*See also* Mot. at 18-19.)

The Improper Opt-Ins' argument that arbitration should be ordered because they have not "waived their right to elect arbitration by opting in to this case" mischaracterizes Chipotle's requested relief. (Resp. at 12.) Chipotle does not seek an order prohibiting the Improper Opt-Ins from *ever* arbitrating their claims; it requests only that this Court dismiss them from the collective without *compelling* them to arbitration. (Mot. at 20 ("Likewise, the Improper Opt-Ins joined this

lawsuit by consent and *waived their right to ask the Court to compel arbitration*.") (emphasis added); *see also* Conclusion (requesting dismissal without prejudice).)

 *BOSC, Inc. v. Board of County Commissioners of County of Bernalillo*, 853 F.3d 1165 (10th Cir. 2017), while addressing the former circumstances (i.e., forever waiver of the right to arbitrate), is persuasive here. It recognizes that waiver comes in two forms: (1) when a party "intentionally relinquishes or abandons its right to arbitration" and (2) when a party's litigation conduct forecloses its right to arbitrate. *Id*. at 1170. The Improper Opt-Ins, by affirmatively and voluntarily submitting their claims for relief to this Court for resolution, have engaged in conduct that evinces an "intentional relinquishment" of any right or intent to have them arbitrated. *Id*. at 1170-71 (citing *Hill v. Ricoh Ams. Corp.*, 603 F.3d 766, 773 (10th Cir. 2010)), for proposition that "a party should not be permitted to demand arbitration when it has previously waived its right to arbitrate in the narrow sense of waiver typically used in the criminal-law context, where a waiver is an intentional relinquishment or abandonment of a known right" (internal quotations omitted); *see also In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1205 (10th Cir. 2016) ("A party can subjectively waive its right to arbitration if it intentionally relinquishes or abandons that right; once it has done so, it has no right to demand arbitration later."). The Tenth Circuit has recognized this intentional relinquishment may occur where, as here, a party refuses to arbitrate but then demands arbitration upon the initiation of a lawsuit. *See BOSC*, 853 F.3d at 1171 (citing *Hill*, 603 F.3d at 773).  Thus, the Improper Opt-Ins—by voluntarily opting-in to this collective—have now waived any right to argue they should be compelled to arbitration.

That same conduct is also dispositive under the second form of waiver, i.e., litigation conduct. The *BOSC* Court stopped short of articulating any "bright-line rule of waiver just because a party has filed a lawsuit." *Id*. at 1173. Yet the conduct salient to its conclusion that arbitration had not been waived was that the party demanding arbitration dismissed its lawsuit and "did not go so far as to voluntarily submit its claims to a court for relief." *Id*. at 1174-75. Here, the Improper Opt-Ins have voluntarily opted in to the collective, submitting their claims to this Court for resolution. Thus, they have waived their right to compel arbitration for this additional reason.

The Improper Opt-Ins cannot have it both ways. They cannot initially disavow any obligation to arbitrate, and then, regretting their strategy (or having been uninformed of its consequences), demand this Court order the very procedure they intentionally forwent. *Duferco* 's directive that "a district court [i]s under no independent obligation to invoke the remedy rejected by the party" thus remains instructive. *Duferco Steel Inc. v. M/V Kalisti*, 121 F.3d 321, 321 (7th Cir. 1997).

## C.  Alternatively, Even if an Arbitrator Determines Arbitrability, the Result is Same

Even if this Court concludes that the Arbitration Agreement did "clearly and unmistakably" give an arbitrator authority to resolve arbitrability (it did not), the result is the same: the ImproperOpt-Ins' claims should not be compelled to arbitration but rather dismissed altogether from this lawsuit. The arguments set forth in section I.B.2 apply with equal weight, insofar as the Improper Opt-Ins have acted in a manner entirely contrary with any intent to invoke their right to arbitration. And it belies principles of judicial economy and common sense to stay this aging collective action in a holding pattern while 2,814 arbitrations may or may not proceed.

Accordingly, even if this Court determines the Arbitration Agreement's validity and scope must be resolved by an arbitrator, it should still dismiss the Improper Opt-Ins from this collective without any compulsory direction to pursue arbitration.

## II.  PLAINTIFFS' COUNSEL SHOULD NOT BE PERMITTED TO FURTHER REPRESENT THE IMPROPER OPT-INS

The basis for Chipotle's request that Plaintiffs' Counsel be prohibited from representing the Improper Opt-Ins in future proceedings related to the claims at issue here is simple: Plaintiffs' Counsel invited the Improper Opt-Ins to breach their Arbitration Agreement with Chipotle. Plaintiffs' Counsel should not, if those contractual rights are enforced, be able to profit or tactically benefit from that interference with Chipotle's contractual rights. (Mot. at 21-23.) Chipotle's request is limited, measured, and reasonable—it imposes no restriction on the Improper Opt-Ins' ability to pursue their claims, only Plaintiffs' Counsel's ability to benefit from or further exploit it.

The basis for that request was not, as the Improper Opt-Ins misunderstand, any alleged ethical violation by Plaintiffs' Counsel. (Resp. at 14-17.) Rather, Chipotle's request is based on the fact that Plaintiffs' Counsel's actions here were tantamount to intentional interference with Chipotle's contractual rights. (Mot. at 18.) The relief requested is therefore akin to damages—or a sanction—intended to put Chipotle back in the same position it would have been if the Improper Opt-Ins were never solicited, and admonish Plaintiffs' Counsel for their actions. Absent the relief Chipotle seeks, those actions have the potential to cause Chipotle to incur extreme costs and expend momentous resources in defending arbitrations that, but for that wrongful invitation, would

likely never have occurred.[5] *See In Re Corn Deriv. Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984) ("One of the inherent powers of any federal court is the admission and discipline of attorneys practicing before it."); *see also Goodyear Tire & Rubber Co. v. Haeger*, 137 S.Ct. 1178, 1186 (2017) ("Federal courts possess certain inherent powers . . . That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process.") (internal citations and quotations omitted). The Improper Opt-Ins' extensive argument concerning disqualification should thus be rejected on its face as nothing more than a strawman argument, intended to divert this Court's attention from these actions. (Resp. at 14-25.) Moreover, their argument fails for several reasons.

First, the Improper Opt-Ins' cited cases offer no support for the proposition that the Improper Opt-Ins' "right to counsel of their choice" is infringed if this Court grants Chipotle its requested relief. (Resp. at 15.) The Improper Opt-Ins mislead this Court in their citation of *Lewis v. Wal-Mart Stores, Inc.*, 2006 WL 1892583 (N.D. Ok. July 10, 2006).[6] While that case recognizes that they have a "right to counsel of [their] choice," it goes on to state that "but that right is not absolute" and may be "overridden only if compelling reasons exist." *Id.* at *4 (internal quotations omitted); *In re BellSouth Corp.*, 334 F.3d 941, 955 (11th Cir. 2003) ("While it is true that there is a constitutionally based right to counsel of choice, it is also well established that the right is not absolute.") (citing *Wheat v. United States* , 486 U.S. 153, 159 (1988)). In determining whether the

---

[5] The Improper Opt-Ins offer no evidence that any Improper Opt-In was considering pursuing his or her FLSA claims prior to receipt of the notice.

[6] The remainder of the cases the Improper Opt-Ins cite are factually distinguishable. Each concerns circumstances in which a party is attempting to disqualify current counsel from the current case, not future representation. (Resp. at 15.)

circumstances are compelling, this Court may consider, among other factors, "the potential for manipulation and impropriety" in permitting the representation to proceed. *BellSouth*, 334 F.3d at 962 (articulating factors relevant to court's ability to exercise discretion over who can practice before it and applying them to a disqualification dispute).

The Improper Opt-Ins' fear that they will "face extreme unfairness, undue prejudice, and harm" if Chipotle's Motion is granted is purely speculative and undeveloped. (Resp. at 19.) They offer no evidence whatsoever that if dismissed from this collective, they would still *want* to retain Plaintiffs' Counsel. *See Lewis*, at *1-2 (relying on fact that five plaintiffs solicited by counsel had actually sought representation from plaintiff's counsel was salient to decision that plaintiffs had right to select counsel).

Similarly, whether "current Plaintiffs' counsel" will face the same speculative and undeveloped hardships is irrelevant to this Court's analysis. (Resp. at 19 (claiming Motion should be denied because "current Plaintiffs' counsel" will be prejudiced).) The right to choice of counsel belongs solely to the Improper Opt-Ins, not Plaintiffs' Counsel. Counsel's self-serving statement only further reveals that Chipotle's concerns that Plaintiffs' Counsel is using this proceeding to further their personal financial interests is well-founded. (Mot. at 21-22.) "Compelling circumstances" therefore exist that justify granting Chipotle's request here.

Second, Chipotle does not rely on any ethics conflict as the basis for its requested relief. (Resp. at 17-24.) Chipotle certainly maintains its observation in footnote 5 of its Motion that Plaintiffs' Counsel's actions are relevant to whether named plaintiffs, and by extension Plaintiffs' Counsel, are adequate representatives going forward. But any such conflict is immaterial to this Court's ability to grant Chipotle's requested relief.

Finally, even if the Improper Opt-Ins' disqualification standard applies (it does not) Chipotle has met it here. Chipotle has standing to disqualify Plaintiffs' Counsel based on a conflict of interest that "if left unaddressed, would clearly call into question the fair or efficient administration of justice." *Shapiro v. Rynek*, Civil Action No. 13-cv-3086-WJM-KMT, 2017 WL 121617, at *3 (D. Colo. Jan. 11, 2017). It is hard to envision a more unjust or inefficient proceeding than what Plaintiffs' Counsel have created here: a purposeful solicitation to nearly 3,000 people to breach their agreement to arbitrate, potentially resulting in thousands of arbitrations (and fee awards) that never would have (or should have) been invited. Accordingly, Plaintiffs' Counsel should be prevented from further representing the Improper Opt-Ins in any subsequent arbitrations,[7] and Chipotle's Motion should be granted.

## CONCLUSION

For the reasons set forth in its Motion and above, Chipotle respectfully requests that the Court: (i) dismiss, without prejudice, the claims of any Improper Opt-In who executed Chipotle's Arbitration Agreement; (ii) prohibit Plaintiffs' Counsel from representing or otherwise communicating with the dismissed Improper Opt-Ins; (iii) provide the Improper Opt-Ins with a Court-authorized notice of the dismissal of their claims and alerting them to the need to secure alternative counsel if they intend to pursue their claims in any forum; and (iv) granting such other and further relief as this Court deems just and proper.

---

[7] Again, the Improper Opt-Ins offer no evidence to support their conclusory assertion that restriction of Plaintiffs' Counsel's future representation is either contrary to the Improper Opt-Ins' desires, or will work an undue hardship on their ability to bring their FLSA claims in arbitration. Given the FLSA's mandatory attorney's fees provision, it is hard to envision that difficulty will exist in locating willing and able counsel. Their arguments should therefore be rejected.

January 12, 2018

Respectfully submitted,

MESSNER REEVES LLP

*s/ John K. Shunk*

John K. Shunk, #16204
Allison J. Dodd, #43835
Adam M. Royval, #43836
Kendra N. Beckwith, #40154
Thomas R. Blackburn, #41136
1430 Wynkoop Street, Suite 300
Denver, Colorado 80202
Telephone:  (303) 623-1800
E-mail: jshunk@messner.com
E-mail: adodd@messner.com
E-mail: aroyval@messner.com
E-mail: kbeckwith@messner.com
E-mail: tblackburn@messner.com

SHEPPARD   MULLIN   RICHTER   &
HAMPTON LLP
Richard J. Simmons
333 South Hope Street
Forty-Third Floor
Los Angeles, CA  90071
rsimmons@sheppardmullin.com

***Attorneys for Defendant, Chipotle Mexican Grill, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on January 12, 2018, I electronically served the foregoing **REPLY IN SUPPORT OF CHIPOTLE MEXICAN GRILL, INC.'S MOTION TO DISMISS OPT-IN PLAINTIFFS BOUND BY CHIPOTLE'S ARBITRATION AGREEMENT** to all counsel of record listed on CM/ECF system:

**Adam Seth Levy** (adamslevey@comcast.net)

**Andrew Curry Quisenberry** (andrew.quisenberry@coloradolaw.net)

**Darin Lee Schanker** (dschanker@coloradolaw.net)

**Julie A. Sakura** (jsakura@hinklelawfirm.com)

**Kent Morgan Williams** (williamslawmn@gmail.com)

**Kevin Edward Giebel** (kgiebel@ggwklaw.com)

**Michael Edmund Jacobs** (mjacobs@hinklelawfirm.com)

**Thomas Mark Hnasko** (thnasko@hinklelawfirm.com)

                   /s/*Jeanine Montoya*

                   Jeanine Montoya